<u>**PUBLIC VERSION**</u>

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CALIFORNIA STEEL INDUSTRIES, INC.<br><br>　　Plaintiff,<br><br>　　　– against –<br><br>UNITED STATES,<br><br>　　Defendant. | Court No. 21-00015 |

<u>**Remand Comments**</u>

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
CHAFFETZ LINDSEY LLP
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com

Counsel for California Steel
Industries, Inc.

**PUBLIC VERSION**

## Table of Contents

I.   Preliminary Statement ........................................................................1

II.  Factual and Procedural Background...................................................3

    A.   The Parties ..................................................................................3

    B.   Regulatory Framework................................................................5

    C.   CSI Files Requests for Exclusions..............................................9

    D.   CSI's Current Action Before the CIT .......................................15

    E.   Remand Proceedings..................................................................16

III. Argument .........................................................................................18

    A.   Legal Framework ......................................................................18

    B.   The Flawed Redeterminations of the 2018 Requests.................21

        1.   The Department Failed to Consider Evidence Showing that
U.S. Steel Does Not Have Available a Sufficient Volume of Slab
to Source CSI's Entire Requests ................................................21

        2.   The Department Failed to Consider Evidence that U.S. Steel
Cannot Provide Slab "Immediately" .........................................27

    C.   The Redeterminations of the 2020 Requests Ignore Years of
Evidence ...................................................................................29

        1.   The 2020 Record Confirmed that U.S. Steel Could Not Source
CSI Slab in Sufficient Volume .................................................29

        2.   Commerce Ignored Evidence that U.S. Steel Could Not Source
CSI Within Eight Weeks .........................................................34

IV. Conclusion.......................................................................................37

__PUBLIC VERSION__

## TABLE OF AUTHORITIES

Page(s)

### Cases

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*,
  923 F.2d 188 (D.C. Cir. 1991) ............................................................ 36

*JSW Steel (USA) Inc. v. United States*,
  466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020) ..................................... 19

*Judulang v. Holder*,
  565 U.S. 42 (2011) ...................................................................... 18, 19

*Linyi Chengen Imp. & Exp. Co. v. United States*,
  391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ..................................... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
  Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................ 19

*NLMK Pennsylvania, LLC v. United States*,
  558 F. Supp. 3d 1401 (Ct. Int'l Trade 2022) ..................................... 20

*NLMK Pennsylvania, LLC v. United States*,
  617 F. Supp. 3d 1316 (Ct. Int'l Trade 2023) ................................ 20, 25

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
  786 F.3d 960 (Fed. Cir. 2015) .......................................................... 25

*Seneca Foods Corp. v. United States*,
  663 F. Supp. 3d 1325 (Ct. Int'l Trade 2023) ..................... 8, 19, 25, 26

*United States v. UPS Customhouse Brokerage, Inc.*,
  575 F.3d 1376 (Fed. Cir. 2009) ........................................................ 28

### Statutes

5 U.S.C. § 706 ........................................................................... 15, 18

PUBLIC VERSION

19 U.S.C. § 1862................................................................. *passim*

**Other Authorities**

15 C.F.R. pt. 705, supp. 1 ................................................ *passim*

*Adjusting Imports of Steel into the United States*, Pres. Proc.
   No. 9705, 83 Fed. Reg. 11,625 (Mar. 8, 2018) ...................... 6

Implementation of New Commerce Section 232 Exclusions
   Portal, 84 Fed. Reg.  26,751 (June 10, 2019) ...................... 7

*Submissions of Exclusion Requests and Objections to
   Submitted Requests for Steel and Aluminum*, 83 Fed.
   Reg. 46,026 (Sept. 11, 2018) ...................................... *passim*

PUBLIC VERSION

## Table of Abbreviations and Defined Terms

| | |
|---|---|
| 2018 Requests | 170 requests for exclusion from the Section 232 tariffs submitted by CSI between April 29, 2018 and July 2, 2018 |
| 2020 Requests | 23 requests for exclusion from the Section 232 tariffs submitted by CSI on April 21, 2020 |
| Commerce | United States Department of Commerce |
| CSI | California Steel Industries, Inc. |
| Defendant | United States |
| Department | United States Department of Commerce |
| Plaintiff | California Steel Industries, Inc. |
| Redeterminations | Remand Results, dated February 9, 2024, ECF No. 94 |
| September IFR | *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46,026 (Sept. 11, 2018) |
| U.S. Steel | United States Steel Corporation |

## I.     Preliminary Statement

California Steel Industries, Inc. ("CSI") commenced this action more than three years ago.  In its straightforward complaint, CSI seeks redress for the almost $[█] million in tariffs it has been required to pay due to the arbitrary and capricious denials by the Department of Commerce ("Commerce" or "the Department") of all of CSI's 193 requests for exclusions from the Section 232 tariffs.  CSI's claim is simple: the Department has failed to consider, evaluate, and deal fairly with the evidence showing that CSI has been unable to acquire the volume of steel slab it needs from domestic sources and hence is entitled to an exclusion from the Section 232 tariffs.

Instead of coming to grips with the evidence in the record, as it is required to, Commerce has simply accepted the unsupported and unfounded claims by United States Steel Corporation ("U.S. Steel") that it has the ability to provide the millions of metric tons of slab that CSI must have and that it can do that "immediately."  The truth, as the record shows, is that not only does U.S. Steel lack the capacity to supply CSI with the requisite volume, but, as a competitor of CSI, it also has no interest in doing so.

CSI uses the slab it requires to manufacture downstream products such as coil and pipe which it then sells in competition with U.S. Steel and other integrated mills.  Given that, it is not surprising that U.S. Steel has no interest in helping CSI when the company is in a jam and needs slab.  This is especially true because, as set forth in the record and later herein, U.S. Steel needs the slab it produces for its own use and to manufacture its own products.

Despite the foregoing, Commerce continues to ignore this reality and the evidence, choosing instead to simply reiterate its mantra that U.S. Steel can and presumably will supply CSI with all the slab it needs in a timely fashion. This is, unfortunately, a pipe dream.  U.S. Steel cannot and will not satisfy CSI's needs and history has confirmed that beyond any serious doubt.

Now, more than five months after the Court granted its request for a remand to reconsider the record and all its denials, the Department has come forward with its latest round of denials.  In these "Redeterminations," Commerce simply repeats the same flawed reasoning it has  applied in the past.  Thus, after supposedly deliberating for all this time, Commerce has done nothing more than

2

once again hang its hat on U.S. Steel's "certification" that it can supply the product CSI needs.  Relying on that naked claim and not dealing with the evidence is, on its face, arbitrary and capricious.

In the current iteration of its denials, Commerce has completely failed to cure the fatal defect—failing to weigh and evaluate hard facts—that has plagued its prior denials.  Belief in the "statements" of U.S. Steel when the evidence shows otherwise is not reasoned agency decisionmaking.  It is therefore time for the Court to step in and require Commerce to follow the evidence, which establishes that the exclusions should have been granted.  The denials run counter to the evidence and cannot stand.

## II.    Factual and Procedural Background

### A.    The Parties

Plaintiff CSI is the largest steel mill in the western United States, with the capacity to produce up to 2,722k metric tons ("MTs")[1] of steel

---

[1] The record uses metric tons and net tons ("NTs") inconsistently.  For reference, 1 metric ton ("MT") is approximately 1.1 net tons ("NTs").  To aid the Court, we convert all tonnages to MTs and provide the equivalent NTs tonnage in a footnote. 2,722k MTs equals 3,000k NTs.

PUBLIC VERSION

sheet annually.[2]  These products include hot rolled, cold rolled, and galvanized sheet, and straight-seam electrical resistance welded line pipe.[3]  The feedstock for all these operations is steel slab.[4]

CSI is a "slab converter" or "re-roller," meaning that it does not have the ability to produce its own steel slab feedstock[5]  Instead, it must rely on others, including its competitors such as U.S. Steel, to provide the slab it needs to sustain its operations.[6]  To operate at  an economically profitable level, CSI requires 2,300k MTs[7] of slab per year.[8]  Unfortunately, for more than thirty years now the domestic

---

[2] APPX06762, APPX22892.  These Comments challenge two tranches of Redeterminations, the Redeterminations of the 2018 Requests and the Redeterminations of the 2020 Requests.  Following the denials, CSI imported slabs pursuant to 45 of its 193 Requests, as set out in Appendices 1 and 2.  CSI specifically challenges these 45 Requests.  The records for the subset of the 2018 Requests that CSI challenges are materially identical, as are the records for the subset of the 2020 Requests CSI challenges.  Thus, for convenience, CSI cites to the lowest-numbered record within each subset. Appendices 1 and 2 cite the start and end pages within the Joint Appendix of the challenged Redeterminations and their corresponding Records.

[3] APPX06762, APPX22880.

[4] APPX06762, APPX22880.

[5] APPX06762, APPX22880.

[6] APPX06680, APPX06762-06764, APPX22880, APPX22884-22885.

[7] 2,535 NTs.

[8] APPX06762, APPX22881.

market has been unable or unwilling to supply CSI with the volume of slab it needs for its operations.[9]  Consequently, CSI has, for decades, been required to import most of the  steel slab it needs.[10]  In the five-year period prior to the imposition of the Section 232 tariffs, for example, CSI was able to purchase, in the United States, just 3 percent of the steel slab it needs for its operations.[11]  It had to import the rest. Accordingly, when the Section 232 tariffs were imposed, CSI began to request exclusions following the procedure specified in the relevant regulations.

### B.    Regulatory Framework

Section 232 of the Trade Expansion Act of 1962 authorizes the President, upon a finding by the Secretary of Commerce that the importation of certain articles poses a national security threat, to "determine the nature and duration of the action that . . . must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."  19 U.S.C. §

---

[9] APPX06681-06685, APPX06762-06764, APPX06770-06771, APPX22880-22885.

[10] APPX06762-06764, APPX22880.

[11] APPX22880.

1862(c)(1)(A)(ii).  Pursuant to Section 232, on March 8, 2018, former-President Trump issued Proclamation 9705, imposing duties on steel imports.  The Proclamation directs the Department of Commerce to grant exclusions from the duties if it determines that any steel product for which an exclusion is requested is not "produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality."  *Adjusting Imports of Steel into the United States*, Pres. Proc. No. 9705, 83 Fed. Reg. 11,625, 11,627 (Mar. 8, 2018).

Following a notice-and-comment period, on September 11, 2018, Commerce issued an interim final rule, which was in effect during  all times at issue here.  *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46,026 (Sept. 11, 2018) ("September IFR").  The rule was intended to "fulfill the Presidential directives . . . to create an exclusion process to ensure users of steel . . . in the United States would continue to have access to steel … that they may need."  *Id.* at 46,026.

The rule provides that an exclusion will be granted when "any of the following three criteria" are met: (1) "the article is not produced in the United States in a sufficient and reasonably available amount," (2)

"is not produced in the United States in a satisfactory quality," or (3) "for specific national security considerations." 15 C.F.R. pt. 705, supp. 1(c)(6).[12]

Commerce's rule sets forth the procedures for affected parties to request exclusions and provides that a domestic producer may object to any such request *if* that producer shows that it can and will "immediately" supply the requestor with "the amount that is needed by the end user requesting the exclusion." 15 C.F.R. pt. 705, supp. 1(c)(6)(i). "Immediately" means that the product "could be produced and delivered 'within eight weeks' in the amount needed for the business activities described in the exclusion request." September IFR, 83 Fed. Reg. at 46,038 (BIS response to Comment (f)(6)(iii)(D)).

Under the regulation, the "burden is on that {objecting} supplier to demonstrate that the exclusion should be denied because of failure to

---

[12] The governing text of the regulation was promulgated in the September IFR. As relevant, the rule was amended once on June 10, 2019, to streamline the logistics of the exclusion filings but not to alter the substantive standards governing the disposition of requests. *See* Implementation of New Commerce Section 232 Exclusions Portal, 84 Fed. Reg. 26,751 (June 10, 2019). Although the rule has been subsequently amended, all denials were finalized prior to such amendments. Therefore, all cites to 15 C.F.R. pt. 705 supp. 1 herein are interchangeably to the versions in effect from September 11, 2019 to June 12, 2019 and from June 13, 2019 to October 12, 2020.

meet the specified criteria." *Id.* at 46,029 (BIS response to Comment

(b)(1)); *see Seneca Foods Corp. v. United States*, 663 F. Supp. 3d 1325,

1330 (Ct. Int'l Trade 2023) (quoting September IFR).  The regulation

sensibly requires the objector to "clearly identify, and provide support

for, its opposition to the proposed exclusion."  15 C.F.R. pt. 705, supp.

1(d)(4).  In other words, simply saying "we can supply the product" is

not enough.  An objector has the burden of "specifying" when and how it

can and will satisfy the Requestor's needs.  *Id.*

To implement its own rule, Commerce pledged that it would

consider not only whether the objector could, in theory, source the

requested steel product, but whether it actually *would* do so.

Specifically, in the regulation, Commerce stated that, in evaluating an

objector's submissions, it would consider whether the  objector

"overcommit{ed} . . . {its} current or future capacity" to "users of the

article other than the applicant."  September IFR, 83 Fed. Reg. at

46,037 (Comment (f)(6)(iii)(A) and BIS responses).  And the regulation

provided that, in determining successive requests by the same company,

Commerce would "take into account" situations where a request was

denied "based on a representation made by an objector, which later is

determined to be inaccurate." 15 C.F.R. pt. 705, supp. 1(c)(6)(i).

Unfortunately, that is precisely what Commerce did *not* do when

denying CSI's requests.

### C. CSI Files Requests for Exclusions

In the United States, the integrated steel mills that produce slab

use that slab for their own production and therefore, generally do not

make it available to mills, such as CSI.[13]  For decades, therefore, CSI

has been required to import, from sources outside the U.S., nearly all

the slab it must have.[14]  The imposition of Section 232 tariffs in 2018

therefore posed an immediate and existential threat to CSI's

operations.[15]  If it could not fill its needs in the domestic market, as had

been the case for years, CSI knew it had to import the slab and that

meant applying for exclusions.[16]  It also meant that, absent a fair

process carefully monitored by Commerce, it would be at the mercy of

its competitors, such as U.S. Steel, and the objection process.

---

[13] APPX06681-06685, APPX06762-06764.

[14] APPX06762-06764, APPX22880.

[15] APPX06678, APPX06685, APPX22891.

[16] APPX06680-06683, APPX06685, APPX22879-22890.

**CSI's 2018 Requests.** Between April 29, 2018, and July 2, 2018, CSI submitted 170 requests for exclusions from the Section 232 tariffs for steel slabs from Japan, Mexico, Russia, and Turkey (the "2018 Requests"). In total, CSI sought to import 2,300k MTs[17] of slabs (although it requested more than that amount because the regulation required overlapping requests).[18] In support of its requests, CSI submitted evidence demonstrating that it cannot reasonably obtain sufficient amounts of the slab required for its operations from domestic sources, and it certainly could not do so "immediately".[19]

Several U.S. steel producers—including U.S. Steel—promptly filed objections to CSI's requests.[20] U.S. Steel, for instance, made the unsupported claim that could supply "100% of the volume cited" in of each of CSI's requests.[21]

---

[17] 2,535k NTs.

[18] APPX06762.

[19] APPX06671-06686, APPX06760-06771.

[20] APPX06718-06737.

[21] APPX06722, APPX06725.

Despite the absence of proof to support the objections of U.S. Steel and others, between February and April 2019, the Department denied every one of CSI's requests.  In the course of doing so, Commerce officials and the objectors engaged in a series of secret, *ex parte* contacts regarding, *inter alia*, CSI's requests.[22]  These contacts were part of a designed lobbying campaign by the domestic steelmakers—who both make slab and compete with CSI's sales of finished steel products—to sabotage the slab exclusion requests.  The plan worked.  Following these *ex parte* communications, Commerce grouped all the slab exclusion requests, from CSI and others, for consideration *en masse*.[23]  Then, it denied all the requests, including those of CSI.[24]

Frustrated by the efforts of the objectors and the complicity of Commerce, and unable to source the volume of slab it needed domestically, CSI sourced as much slab as it could from non-tariff

---

[22] APPX14716-14717, APPX14732-14740, APPX14809-14815, APPX14915, APPX14921, APPX14972-14975, APPX14988-14994.

[23] APPX14780, APPX14786, APPX14789, APPX14820, APPX14866-14367, APPX14935-14936.

[24] As the Court previously recognized, these impermissible *ex parte* communications and other administrative issues made "{t}he process . . . a complete trainwreck." ECF No. 74 at 13:13.

bearing countries[25] and then it was forced to import thousands of metric tons of steel slabs from Mexico and Japan in 2018, paying in excess of $[        ] million in Section 232 tariffs.[26]  In 2018, CSI could source only [ ] percent of the amount of its request—[ ] percent of its minimum annual needs—domestically.[27] Thus CSI either had to pay the tariffs or cease competing in the market.

In an effort to mitigate the problem and avoid paying as much as it could in tariffs, CSI agreed to purchase any and all spot slab offers from U.S. Steel in 2018 and through the third quarter 2019.[28]  It also entered into a contract with U.S. Steel to purchase [        ] MTs[29] per

---

[25] APPX06764, APPX22880-22881, APPX22888-22890.

[26] *Cf.* ECF No. 73.  These imports would have been subject to Request Nos. BIS-2018-0006-5348, BIS-2018-0006-5375, BIS-2018-0006-5376, BIS-2018-0006-5385, BIS-2018-0006-5389, BIS-2018-0006-5392, BIS-2018-0006-5393, BIS-2018-0006-5399, BIS-2018-0006-5404, BIS-2018-0006-5409, BIS-2018-0006-5452, BIS-2018-0006-5487, BIS-2018-0006-5492, BIS-2018-0006-5496, BIS-2018-0006-5497, BIS-2018-0006-5511, BIS-2018-0006-8301, BIS-2018-0006-8334, BIS-2018-0006-8338, BIS-2018-0006-8368, BIS-2018-0006-8372, BIS-2018-0006-8377, BIS-2018-0006-8380, BIS-2018-0006-8385, BIS-2018-0006-8388, BIS-2018-0006-8391, BIS-2018-0006-8395, BIS-2018-0006-8401, BIS-2018-0006-8407, BIS-2018-0006-8429, BIS-2018-0006-8433.

[27] APPX22956.

[28] APPX22931.

[29] [        ] NTs.

month in 2018.[30] But, these efforts ended up producing in total only

294k MTs[31] in total offers of slab (contract and spot) from U.S. Steel, a

small portion of its needs.[32]  Not only was the volume inadequate but

U.S. Steel delivered about half of these slabs late, and a significant

number suffered quality issues rendering them unusable.[33]

Despite the bad experience but desperate to acquire steel

domestically if possible (and avoid the tariffs) CSI was prepared to buy

whatever it could from U.S. Steel in 2020.  However, U.S. Steel

specifically advised CSI that it would only agree to furnish about 19

percent of CSI's needs.[34]  Given that, CSI filed a new set of exclusion

requests.

**CSI's 2020 Requests**.  On April 21, 2020, with the background

described above, CSI filed a second round of exclusion requests, this

---

[30] APPX06787.

[31] 324k NTs.

[32] APPX22931.

[33] APPX22927-22928, APPX22935.

[34] APPX22931.  U.S. Steel offered "in the range of 20,000 to 40,000 net tons {i.e., 18k to 36k MTs}" per month. APPX22931.  This is around 19 percent of the 2,300k MTs annually that CSI needs to operate in an economically efficient manner (36k MTs x 12 / 2,300k MTs = ~19%).

time consisting of twenty-three specific requests, seeking to import an aggregate of 425k MTs[35] of steel slabs from Japan (the "2020 Requests").[36]  CSI's submissions explained that, despite its objections to CSI's 2018 Requests, neither U.S. Steel nor any other objector was able and willing to supply CSI with the slabs it required.[37]  Shockingly, despite having told CSI that it could only supply a very limited amount of slab, U.S. Steel nonetheless objected again.  Unembarrassed and undeterred by its prior admission, U.S. Steel rehashed the same false claim that it could and would meet CSI's slab needs.[38]

As with the 2018 Requests, on September 5, 2020, Commerce rejected every one of CSI's requests.  The Department's determinations were naïve and unrealistic.  They were, again, based on the unwavering acceptance of U.S. Steel's naked claims, and not on the record.  The plain fact is that CSI was again unable to secure the slabs it needed

---

[35] 468k NTs.

[36] APPX22879. At this point, unable to secure slab domestically and trying to avoid the draconian tariffs, CSI was obtaining slab, whenever possible, from countries not subject to the tariffs.  APPX22890.

[37] APPX22884-22888, APPX22931.

[38] APPX22908-22923.

from U.S. companies; it, therefore, once again had to import slabs and

pay the tariffs.  In 2020, CSI imported thousands of metric tons of slabs

from Japan, paying in excess of $[███] million in tariffs.[39]

### D.    CSI's Current Action Before the CIT

On January 14, 2021, CSI filed this action challenging the

Department's denials of its requests as arbitrary and capricious in

violation of the APA.  *See* 5 U.S.C. § 706(2)(A).

At the time it filed its Answer and the Administrative Record, the

Department filed a separate 312-page appendix of documents revealing

for the first time the series of *ex parte* communications that had

occurred.  This supplemental appendix confirmed what everyone

suspected, there had been secret dialogues between the Department

and the objectors,[40] and that Commerce itself initiated many of these *ex*

*parte* communications.[41]  Making matters worse, when it confessed to

---

[39] *Cf.* ECF No. 73.  These imports would have been subject to Request Nos. 82953, 82957, 82962, 82989, 82991, 83005, 83015, 83019, 83026, 83031, 83039, 83043, 83046, 83049.

[40] APPX14716-14717, APPX14732-14740, APPX14809-14815, APPX14915, APPX14921, APPX14972-14975, APPX14988-14994.

[41] APPX14914, APPX14915, APPX14996-15000.

these improper, secret communications, Commerce was also forced to admit that it could not even identify all the relevant *ex parte* communications, and that it was, as a result, unable to certify that the supplemental appendix was complete. ECF No. 34 at 2.

### E.    Remand Proceedings

On July 26, 2021, before CSI could move for judgment on the agency record, the Government sought a voluntary remand. In its remand motion, Commerce recognized that given its unreasoned decisions, the *ex parte* communications, and serious concerns over whether the administrative record was complete, its decisions could not withstand judicial review. ECF No. 44 at 10. The Department thus asked that it be allowed to conduct a "new and independent review" of CSI's requests. *Id.* The Court granted the Department's motion on September 6, 2023. ECF Nos. 86, 87.

The Department filed its remand results (the "Redeterminations") on February 9, 2024, ECF No. 94, five months later. The Redeterminations purported to be decided by Eric Longnecker, the Director, Office of Strategic Industries and Economic Security, and each decision "certifie{d} that {Mr. Longnecker} did not participate in and has

not relied upon any communications or decisions from the original decision proceedings in forming this decision."[42]  Nonetheless, Commerce remarkably reached the exact same decision as before—it denied every single one of CSI's 193 requests.  And it did so, as in the past, relying principally on U.S. Steel's unsupported but "certified" statements in Commerce's form that it *could* "manufacture" "100%" "of the total steel product tonnage requirement covered under the Exclusion Request" "on a timely basis."[43]

The form, which Commerce developed, and the objectors must sign, simply asks objectors such as U.S. Steel to certify that it has the *capability* of providing the product.[44]  Strangely and critically, it fails to ask the crucial question as to whether the company is both willing and able, given its own needs, to supply the volume requested.  That is the

---

[42] APPX01406, APPX01012.  We note that the Department was careful to avoid saying that others who participated in the remand process and provided views on the exclusion requests did not participate or rely upon the tainted prior communications.

[43] APPX01409, APPX01016, APPX06718-06722, APPX22908-22911.

[44] APPX06722, APPX22910.

key question, and it is the one Commerce has failed to ask and U.S. Steel, of course, has never answered.

The answer to that question is, as the record shows, that U.S. Steel is neither willing nor able, after satisfying its own needs, to satisfy those of CSI, and that is the critical fact which Commerce stubbornly fails to recognize. It underlies the basic flaws in Commerce's conclusions and denials.

## III.   Argument

### A.   Legal Framework

As this Court well knows, under the APA, the Court will set aside challenged agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While "a court is not to substitute its judgment for that of the agency" when conducting such a review, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Thus, the Court "must assess . . . whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (cleaned up). "That task involves examining the

reasons for agency decisions—or, as the case may be, the absence of such reasons." *Id.*  Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

To permit meaningful judicial review, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43. In the Section 232 context, this requires the agency to "explain what information {it} considered, how it was weighed, {and} why the evidence compelled denial." *JSW Steel (USA) Inc. v. United States*, 466 F. Supp. 3d 1320, 1330 (Ct. Int'l Trade 2020).  Although the agency may rely on a sworn statement of an objector, the agency "must still consider countervailing evidence that creates doubt about the veracity of a party's statements." *Seneca*, 663 F. Supp. 3d at 1339 (cleaned up) (remanding Section 232 denial that relied on U.S. Steel's

certified statements concerning steel availability without considering countervailing evidence). That is precisely what Commerce failed to do here.

Blindly accepting a "certified" statement contained in a form while ignoring the contrary evidence, will lead, as it has here, to an unsupportable result, which the courts cannot abide. *NLMK Pennsylvania, LLC v. United States*, 558 F. Supp. 3d 1401, 1406–07 (Ct. Int'l Trade 2022) (instructing the Department, on remand of a Section 232 exclusion request denial, "to account for evidence that detracts from the conclusion" and render a conclusion that is "reasonably supported by the record evidence"). In other words, where, as here, Commerce has failed, to "explain its determination, specifically, how the record supports its determination in light of the relevant law and considering what fairly detracts from its conclusion," the ruling cannot stand. *Id.*; *NLMK Pennsylvania, LLC v. United States*, 617 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2023) ("*NLMK II*") (re-remanding exclusion denials because Commerce "does not engage with evidence which runs contrary to its decision").

**PUBLIC VERSION**

B.    The Flawed Redeterminations of the 2018 Requests

1.    The Department Failed to Consider Evidence Showing that U.S. Steel Does Not Have Available a Sufficient Volume of Slab to Source CSI's Entire Requests

As previously noted, the Redeterminations relied, almost exclusively, on U.S. Steel's statement in the Commerce form,[45] that it "produces or could produce a sufficient amount of the product to meet CSI's specified business activity."[46]  However, the factual evidence in the record does not support that statement or the conclusion that U.S. Steel could or would in reality source the 2,300k MTs[47] of slab that CSI requested.  Commerce's blind acceptance of U.S. Steel's statement was therefore arbitrary and capricious.  *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1294 (Ct. Int'l Trade 2019)

---

[45] The form requires the objector to fill in a box specifying the amount of the requestor's need the objector could timely satisfy.  U.S. Steel routinely fills in "100%" and Commerce, in turn, routinely relies on that "certification" to the exclusion of contrary evidence.  APPX06722, APPX22910.

[46] APPX01409, APPX01017.  As noted, the representation that U.S. Steel "could" do so may or may not be true but in either event it does not speak to the crucial element of the regulation—not whether the objector *could* (if it wished to forgo its own or other's needs) supply the product in sufficient volume but whether it is representing it will do so, i.e., that it is ready willing and able.

[47] 2,535 NTs.

(holding a decision of Commerce was "arbitrary and capricious" where the record evidence did not support Commerce's conclusion).

In support of its 2018 Requests, CSI and U.S. Steel both submitted evidence showing that U.S. Steel had supplied CSI with only [____] MTs[48] per month, or about [█] percent of CSI's total 2,300k MT[49] request.[50] The record also showed that U.S. Steel was unable or unwilling to supply more slab to CSI because domestic rolling capacity significantly exceeded domestic slab casting capacity, meaning U.S. Steel needed the slab capacity to meet its *own* needs.[51] Interestingly, the record shows U.S. Steel was so strapped that it had to import slab in 2017 and 2018 to meet its needs.[52]

CSI further explained to the Department that U.S. Steel had no incentive to provide slab to CSI before satisfying its own needs because CSI and U.S. Steel are competitors, meaning it is better business for

---

[48] [____] NTs.

[49] 2,535k NT

[50] APPX06764, APPX06787.   [███] MTs * 12 / 2,300k MTs = ~[█]%.

[51] APPX06764, APPX06766, APPX06770-06771.

[52] APPX06766.

U.S. Steel to use the slab itself rather than sell them to a competitor for use in the production of competing downstream goods.[53]  In sum, while CSI candidly admitted that U.S. Steel had supplied *some* of CSI's 2,300k MTs[54] requests, CSI showed that U.S. Steel could not and would not source all of it in light of the company's own needs and limitations.

U.S. Steel's evidence confirmed CSI's contention and proof.  Thus, for example, U.S. Steel admitted it could not supply any more than [ █ █ ] MTs per month until at least the "[ ███████ ],"[55] when it planned for its "full steelmaking capacity {to be} brought back on-line."[56] Even then, U.S. Steel's data showed that it was only able to book [ ██ ][57] MTs of slab sales to the entire domestic industry for the fourth quarter of 2018.[58]  None of this is disputed.

---

[53] APPX06679, APPX06682, APPX06766-06770.

[54] 2,535 NTs.

[55] APPX06787.

[56] APPX06782, APPX06783.

[57] [ █ ] NTs.

[58] APPX06787.

PUBLIC VERSION

Although the regulation required Commerce to consider all the foregoing and specifically whether U.S. Steel "overcommit{ed} . . . {its} current or future capacity" by sourcing its own needs rather than sourcing its competitors like CSI, Commerce did not do so. *See* September IFR, 83 Fed. Reg. at 46,037 (Comment (f)(6)(iii)(A) and BIS responses). In fact, this evidence was unfortunately and inexplicably ignored, as Commerce proceeded simply to deny every request.

Compounding the problem, when denying CSI's requests, the Department did not even bother to consider the evidence that U.S. Steel's total sales of slab to all purchasers in 2018 was nowhere near the 2,300k MTs[59] that CSI, alone, needed. Commerce made no effort to explain this anomaly. How could U.S. Steel claim it was prepared to supply CSI with 2,300k MTs when it supplied less than that to the entire industry? Commerce apparently did not bother to ask.

Nor did Commerce attempt to deal with the fact that U.S. Steel itself admitted it could not provide CSI with more than [ ▮ ] MTs[60]

---

[59] 2,535 NTs.

[60] [ ▮ ] NTs.

24

per month until at least [████] after the planned restart of its Granite City facility.  Shutting its eyes and not considering or explaining its refusal to grant the exclusions in light of all this evidence is the definition of arbitrary and capricious.  *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015) (holding that an agency cannot "disregard" evidence "without explanation"); *see also NLMK II,* 617 F. Supp. 3d at 1325 (remanding Section 232 exclusion denials because it was "unclear" whether Commerce considered "evidence on the record that Objectors could not, in fact, supply the requested quantities of slab due to idled production facilities and preexisting sales commitments").

Commerce's decision to just accept whatever U.S. Steel says as a basis for denying exclusion requests is not unique to the CSI requests. In fact, this Court recently remanded a Section 232 denial because, as it has in this case, Commerce simply relied on U.S. Steel's certification to the exclusion of contrary evidence.  *Seneca*, 663 F. Supp. 3d 1325.  In *Seneca*, as here, U.S. Steel claimed it could supply the full volume of the request and pointed to its spot sales of steel as evidence to support the contention. *Id.* at 1339.  The requestor responded, submitting evidence

showing that U.S. Steel did not offer sufficient volume through spot sales, and therefore that U.S. Steel's "certified statement" could not and should not be credited. *Id.* at 1337. The Department, however, nonetheless chose to accept U.S. Steel's statement, ignore the evidence, and deny the requests. Seneca brought suit claiming, as does CSI, that Commerce's approach is arbitrary and capricious and cannot be sustained.

In reversing Commerce's ruling, the court noted that, "while USS indeed made a certified factual statement to the agency that USS could fulfill all of {requestor's} demand via spot sales, Commerce's obligation to review all 'relevant data and articulate a satisfactory explanation for its action' is unflagging" and required Commerce "to consider and address" "countervailing evidence" showing that U.S. Steel's "certified statements" were incorrect. *Id.* at 1339. The situation is the same here. The Redeterminations credit U.S. Steel's certified statements but ignore entirely the evidence showing that U.S. Steel was not willing or able to

source CSI with 2,300k MTs[61] of slabs.  This is an arbitrary and

capricious decision and cannot be sustained.

>    ### 2.    The Department Failed to Consider Evidence that U.S. Steel Cannot Provide Slab "Immediately"

Because U.S. Steel's objections rested on its purported "full

steelmaking capacity" which, it hoped, would be "brought back on-line

with the reintroduction of Granite City Works' hot end operations" in

*2018Q4*,[62] the Department should have granted CSI's requests over U.S.

Steel's objections for a separate reason—U.S. Steel could not provide

sufficient volumes of slab "immediately" within the meaning of the

regulation.

Under the regulation, an objector must show that it is "able to

supply the product 'immediately' in order to meet the demand identified

in the exclusion request."  15 C.F.R.  pt. 705, supp. 1(d)(4).

"'Immediately' means whether a product is currently being produced or

could be produced and delivered 'within eight weeks' in the amount

needed for the business activities described in the exclusion request."

------

[61] 2,535 NTs.

[62] APPX06782, APPX06783, APPX06787.

September IFR, 83 Fed. Reg. at 46,038 (BIS response to Comment (f)(6)(iii)(D)) (emphasis added).[63]

U.S. Steel's own evidence establishes, as the company admitted, that it could not supply CSI with more slab than [      ] MTs[64] until at least the "[            ]," when it planned to restart its Granite City facility.[65] Thus, U.S. Steel implicitly acknowledged that it could not "produce and deliver" any new steel slabs "within eight weeks" of its June 2018 objections as required by the regulation. 15 C.F.R. pt. 705, supp. 1(d)(4); September IFR, 83 Fed. Reg. at 46,038. Yet this somehow eluded Commerce.

---

[63] As an apparent alternate rationale, the Redeterminations initially refused to consider CSI's challenge to "U.S. Steel's delivery times and production capacity," reasoning that the immediateness inquiry concerned only "manufacturing time" and not "delivery times and production capacity." APPX01410. To the extent this was the basis for the denials, it was clear error as a matter of law. It is classically arbitrary and capricious for the Department to fail to follow its own regulation, as the Department did by failing to consider delivery in the immediateness inquiry. *See United States v. UPS Customhouse Brokerage, Inc.*, 575 F.3d 1376, 1382 (Fed. Cir. 2009) ("An agency must follow its own regulations.").

[64] [      ] NTs.

[65] APPX06782, APPX06783, APPX06787.

### C.    The Redeterminations of the 2020 Requests Ignore Years of Evidence

#### 1.    The 2020 Record Confirmed that U.S. Steel Could Not Source CSI Slab in Sufficient Volume

In denying CSI's 2020 Requests, Commerce ignored two years' worth of evidence confirming what CSI told the Department in 2018—that U.S. Steel simply could not and would not provide the volume CSI required.

For 2020, CSI submitted requests for exclusion to import 425k MTs[66] from Japan to make up a shortfall in what it could procure from tariff-exempt sources and the minimal amounts it could procure in the domestic market from U.S. Steel.[67]  The uncontroverted evidence before Commerce established that U.S. Steel could not provide CSI with 425k MTs[68] of slab in 2020.  The evidence shows that CSI attempted to obtain slab from U.S. Steel every month following the commencement of the tariffs in March 2018—including by a commitment to purchase all of

---

[66] 468k NTs.

[67] APPX22879.

[68] 468 NTs.

**PUBLIC VERSION**

U.S. Steel's spot offers in 2018 and through the third quarter of 2019.[69] But U.S. Steel could not and did not provide the slab CSI needed.  In fact, in 2019, following the denial of its 2018 Requests, CSI was only able to procure 294k MTs[70] of slab—13 percent of its utilization target—from U.S. Steel.[71]  More egregiously, from January 2020 through June 2020, U.S. Steel only supplied CSI with [█] MTs[72] of slabs—a miniscule [█] percent of its needs for its target utilization.[73]

Moreover, CSI submitted unrebutted evidence that U.S. Steel was, during this same time period, reducing its capacity.  Beginning in 2020, U.S. Steel was idling capacity at its Granite City, Gary, and Braddock (or Mon Valley) facilities.[74]  These were the very facilities that U.S. Steel stated in its objections would be the source of the slabs it claimed

---

[69] APPX22931.

[70] 324k NTs.

[71] APPX22883.  294k MTs /2,300k MTs = ~13%.

[72] [█] NTs.

[73] APPX22957.  [█] MTs supplied to CSI through June 2020 / 2,300k MTs = [█]%.

[74] APPX22885, APPX22912.

PUBLIC VERSION

it could supply.[75]  In fact, these were the plants from which U.S. Steel had [███████████] it had provided CSI between 2018 and 2020.[76]

Idling these facilities represented a significant loss in production, namely a reduction of 8.2 million MTs[77] of steelmaking capacity annually.[78]  In light of these reductions in capacity, as noted above U.S. Steel only supplied about [█] percent of CSI's needs in the first half of 2020,[79] and going forward, U.S. Steel would only offer CSI, "in the range of 20,000 to 40,000 net tons {18k to 36k MTs} a month" for 2020—totaling, at most, 432k MTs[80] per year, less than 20 percent of CSI's target utilization needs.[81]  The Redeterminations never considered or addressed these critical issues.

---

[75] APPX22908.

[76] APPX22908, APPX22956-22957.

[77] 9,035 NTs.

[78] APPX22912.

[79] U. Steel supplied [███] MTs ([███] NTs) to CSI through June 2020.  APPX22957. [███] MTs / 2,300k MTs = [█]%.

[80] 480k NTs.  36k MTs x 12 = 432k MTs.

[81] APPX22931.  36k MTs x 12 / 2,300k MTs = ~19%.

In a similar vein, if, during its Redeterminations, Commerce had carefully examined the evidence, as it should have, it would have realized that U.S. Steel's evidence confirmed the fact that the company could not furnish 425k MTs[82] to CSI in 2020. The historical data U.S. Steel submitted shows the company's actual ability to supply slabs.[83] Specifically, the evidence demonstrated that:

- In 2018, U.S. Steel supplied [ ] MTs[84] to all domestic buyers, amounting to [ ] different companies. This was [ ] MTs[85] less than CSI needed for its business. [86]

- In 2019, U.S. Steel supplied [ ] MTs[87] to [ ] domestic buyers, but only [ ] MTs[88] to CSI.[89]

---

[82] 468 NTs.

[83] APPX22956-22957.

[84] [ ] NTs.

[85] [ ] NTs.

[86] APPX22956.

[87] [ ] NTs.

[88] [ ] NTs.

[89] APPX22956-22957.

- In 2020, U.S. Steel supplied [▮] MTs[90] to [▮] domestic buyers. Of this, it supplied [▮] MTs[91] to CSI, woefully short of CSI's needs.[92]

Altogether, U.S. Steel's confidential data showed that there was no year where the company supplied 425k MTs[93] to CSI, and no year where U.S. Steel could have sourced CSI the amount of slab CSI needed.[94] U.S. Steel, understandably perhaps, was taking care of its own needs and its existing slab commitments before worrying about CSI.[95] Why Commerce could not see that is a mystery. This is especially true since the regulation specifically required Commerce to consider whether U.S. Steel had "overcommitt{ed}" its slab supply to "users of the article other than" CSI and to "take into account" U.S. Steel's failure to provide CSI the slab it needed following the denial of the 2018 Requests. September IFR, 83 Fed. Reg. at 46,037.

---

[90] [▮] NTs.

[91] [▮] NTs.

[92] APPX22957.

[93] 468k NTs.

[94] APPX22956-22957.

[95] APPX22882-22884, APPX22931.

Whatever the reasons for Commerce's failure, the fact remains that as a result, CSI had no choice but to import slab and pay the tariffs to compensate for the shortfall in the domestic market. That should not have been necessary because its requests for the tariff exclusions should have been granted. Regrettably and inexplicably the Redeterminations ignore all this evidence. That is fatal.

### 2. Commerce Ignored Evidence that U.S. Steel Could Not Source CSI Within Eight Weeks

In its 2020 Requests, CSI demonstrated that about [█] percent of U.S. Steel's deliveries between April and December 2019 were more than two weeks late, and that [█] percent of all deliveries occurred more than eight weeks from CSI's purchase order, meaning that the slabs were not provided "immediately" under the regulation—i.e., within eight weeks of the purchase order.[96]  15 C.F.R. pt. 705, supp. 1(d)(4).  In response, U.S. Steel did not contest that almost half of its shipments were delivered in more than eight weeks, but strangely argued that it was CSI's fault, claiming CSI should have requested

---

[96] APPX22928, APPX22935, APPX22937.

"priority delivery,"[97] and referencing confidential data showing that delivery to CSI could take as long as [█] days.[98]

Despite the effort to blame CSI for U.S. Steel's failures, the regulation is clear that demonstrating the ability to deliver within eight weeks was U.S. Steel's burden.  September IFR, 83 Fed. Reg. at 46,029.  The "you didn't ask for priority delivery" defense is ridiculous.  U.S. Steel never discloses what "priority delivery" was, whether "priority delivery" was available to CSI, or whether it could deliver more than [█] percent of slab volumes within eight weeks if CSI had asked for "priority delivery."  The only record evidence in favor of U.S. Steel's position is it "certified statements" that it could provide the slabs within eight weeks.  That is woefully inadequate because the facts in the record show that it could not, and did not, do so.

Commerce gave lip service to the problem of U.S. Steel's "past delivery issues," but it went on to brush the issue aside by proclaiming "there is nothing in CSI's documentation that demonstrates that

---

[97] APPX22914, APPX22952.

[98] APPX22959.

current and future production and deliveries are impacted by any past

delivery issues."[99]  This novel notion that past failures aren't evidence of

future inability to perform is not only nonsensical, it impermissibly

shifts the "burden . . . to demonstrate that the exclusion should be

denied" from U.S. Steel, where it is placed by the regulation, to CSI.

September IFR, 83 Fed. Reg. at 46,029.  The regulation does not, and

cannot, require CSI to adduce evidence of U.S. Steel's "future" inability

to source slabs in a timely manner because CSI does not possess that

information.  As the Redeterminations point out, U.S. Steel "is in a

better position than CSI to know the limits of its own production

schedule."[100]  Requiring CSI to adduce information that it does not

control and cannot know and to sweep under the rug evidence of U.S.

Steel's past failure is facially arbitrary and capricious.

In sum, the conclusion that U.S. Steel could deliver slabs

"immediately" under the regulation was "flatly contradicted by the

---

[99] APPX01017.

[100] APPX01017.

agency's own record," and cannot stand. *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991).

## IV.    Conclusion

Despite the evidence CSI adduced and despite what the record shows, Commerce has been hell bent on denying any and every request the company files.  This has gone on for six years now.  Not knowing or understanding why this is so, CSI respectfully submits it is time to put this saga to an end.  Commence must deal with the facts in the record and render clear, non-arbitrary decisions.  Until they do, the denials cannot stand, and CSI should not have to keep filing lawsuits to secure the result to which it is entitled.

Accordingly, and for the foregoing reasons, the Court should remand the following Requests to Commerce with instructions to issue a reasoned, non-arbitrary decision that would grant:  Request Nos. BIS-2018-0006-5348, BIS-2018-0006-5375, BIS-2018-0006-5376, BIS-2018-0006-5385, BIS-2018-0006-5389, BIS-2018-0006-5392, BIS-2018-0006-5393, BIS-2018-0006-5399, BIS-2018-0006-5404, BIS-2018-0006-5409, BIS-2018-0006-5452, BIS-2018-0006-5487, BIS-2018-0006-5492, BIS-2018-0006-5496, BIS-2018-0006-5497, BIS-2018-0006-5511, BIS-2018-

0006-8301, BIS-2018-0006-8334, BIS-2018-0006-8338, BIS-2018-0006-8368, BIS-2018-0006-8372, BIS-2018-0006-8377, BIS-2018-0006-8380, BIS-2018-0006-8385, BIS-2018-0006-8388, BIS-2018-0006-8391, BIS-2018-0006-8395, BIS-2018-0006-8401, BIS-2018-0006-8407, BIS-2018-0006-8429, BIS-2018-0006-8433, 82953, 82957, 82962, 82989, 82991, 83005, 83015, 83019, 83026, 83031, 83039, 83043, 83046, 83049.

**PUBLIC VERSION**

Dated:      New York, New York
            April 8, 2024

Respectfully submitted:

CHAFFETZ LINDSEY LLP
By:   /s/ Sanford Litvack

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com
*Counsel for Plaintiff California*
*Steel Industries, Inc.*

<u>**PUBLIC VERSION**</u>

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that CSI's Remand Comments, filed on April 8, 2024 complies with the word limitation requirement.  The word count for CSI's Remand Comments, as computed by Chaffetz Lindsey LLP's word processing system, is 6,823.

<u>/s/ R. Matthew Burke</u>
R. Matthew Burke

PUBLIC VERSION

**APPENDIX 1**
**Challenged 2018 Requests**

| Request No. | Redetermination First Page | Redetermination Last Page | Record First Page | Record Last Page |
|---|---|---|---|---|
| BIS-2018-0006-5348 | APPX01405 | APPX01410 | APPX06665 | APPX06787 |
| BIS-2018-0006-5375 | APPX01471 | APPX01476 | APPX07880 | APPX07982 |
| BIS-2018-0006-5376 | APPX01477 | APPX01482 | APPX07983 | APPX08085 |
| BIS-2018-0006-5385 | APPX01513 | APPX01518 | APPX08589 | APPX08717 |
| BIS-2018-0006-5389 | APPX01525 | APPX01530 | APPX08842 | APPX08965 |
| BIS-2018-0006-5392 | APPX01537 | APPX01542 | -- | -- |
| BIS-2018-0006-5393 | APPX01543 | APPX01548 | APPX09214 | APPX09337 |
| BIS-2018-0006-5399 | APPX01561 | APPX01566 | APPX09467 | APPX09582 |
| BIS-2018-0006-5404 | APPX01573 | APPX01578 | APPX09684 | APPX09783 |
| BIS-2018-0006-5409 | APPX01579 | APPX01584 | APPX09784 | APPX09889 |
| BIS-2018-0006-5452 | APPX01585 | APPX01590 | APPX09890 | APPX10008 |
| BIS-2018-0006-5487 | APPX01645 | APPX01650 | APPX11023 | APPX11146 |
| BIS-2018-0006-5492 | APPX01651 | APPX01656 | APPX11147 | APPX11267 |
| BIS-2018-0006-5496 | APPX01663 | APPX01668 | APPX11383 | APPX11503 |
| BIS-2018-0006-5497 | APPX01669 | APPX01674 | APPX11504 | APPX11624 |
| BIS-2018-0006-5511 | APPX01699 | APPX01704 | APPX12099 | APPX12216 |
| BIS-2018-0006-8301 | APPX01837 | APPX01842 | APPX15146 | APPX15262 |
| BIS-2018-0006-8334 | APPX01933 | APPX01938 | APPX17033 | APPX17152 |
| BIS-2018-0006-8338 | APPX01939 | APPX01944 | APPX17153 | APPX17273 |
| BIS-2018-0006-8368 | APPX01945 | APPX01950 | APPX17274 | APPX17394 |
| BIS-2018-0006-8372 | APPX01957 | APPX01962 | APPX17516 | APPX17636 |
| BIS-2018-0006-8377 | APPX01963 | APPX01968 | APPX17637 | APPX17757 |
| BIS-2018-0006-8380 | APPX01969 | APPX01974 | APPX17758 | APPX17886 |
| BIS-2018-0006-8385 | APPX01975 | APPX01980 | APPX17887 | APPX18005 |
| BIS-2018-0006-8388 | APPX01981 | APPX01986 | APPX18006 | APPX18130 |
| BIS-2018-0006-8391 | APPX01987 | APPX01992 | APPX18131 | APPX18257 |
| BIS-2018-0006-8395 | APPX01993 | APPX01998 | APPX18258 | APPX18384 |
| BIS-2018-0006-8401 | APPX02005 | APPX02010 | APPX18512 | APPX18638 |
| BIS-2018-0006-8407 | APPX02011 | APPX02016 | APPX18639 | APPX18765 |
| BIS-2018-0006-8429 | APPX02035 | APPX02040 | APPX19147 | APPX19255 |
| BIS-2018-0006-8433 | APPX02053 | APPX02058 | APPX19501 | APPX19625 |

PUBLIC VERSION

**APPENDIX 2**
**Challenged 2020 Requests**

| Request No. | Redetermination First Page | Redetermination Last Page | Record First Page | Record Last Page |
|---|---|---|---|---|
| 82953 | APPX01011 | APPX01019 | APPX22868 | APPX22960 |
| 82957 | APPX01020 | APPX01028 | APPX22961 | APPX23053 |
| 82962 | APPX01029 | APPX01036 | APPX23054 | APPX23248 |
| 82989 | APPX01037 | APPX01044 | APPX23149 | APPX23240 |
| 82991 | APPX01045 | APPX01053 | APPX23242 | APPX23333 |
| 83005 | APPX01072 | APPX01080 | APPX23518 | APPX23609 |
| 83015 | APPX01089 | APPX01096 | APPX23702 | APPX23794 |
| 83019 | APPX01097 | APPX01105 | APPX23795 | APPX23886 |
| 83026 | APPX01106 | APPX01113 | APPX23887 | APPX23980 |
| 83031 | APPX01114 | APPX01122 | APPX23981 | APPX24073 |
| 83039 | APPX01131 | APPX01138 | APPX24168 | APPX24261 |
| 83043 | APPX01139 | APPX01147 | APPX24262 | APPX24354 |
| 83046 | APPX01148 | APPX01156 | APPX24355 | APPX24447 |
| 83049 | APPX01157 | APPX01165 | APPX24448 | APPX24540 |