IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
                               )

CALIFORNIA STEEL INDUSTRIES,   )
INC.,                               )
                               )

     Plaintiff,                )        **PUBLIC**
                               )

     v.                       )        Court No. 21-cv-00015
                               )

UNITED STATES,               )
                               )

     Defendant.              )
_____ )

<u>DEFENDANT'S RESPONSE TO PLAINTIFF'S REMAND COMMENTS</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-5196
Email:  stephen.tosini@usdoj.gov

May 20, 2024              Attorneys for Defendant

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| _____ ) | |
| CALIFORNIA STEEL INDUSTRIES, ) INC., ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Court No. 21-cv-00015 |
| UNITED STATES, ) ) | |
| Defendant. ) _____ ) | |

<u>ORDER</u>

On consideration of plaintiff's comments on the Department of Commerce's remand results, defendant's response, and all other pertinent papers, it is hereby

ORDERED that each of the 193 the challenged remand results are sustained and, it is further

ORDERED that judgment is entered for the United States.


Dated:_____                    _____
        New York, N.Y.                                JUDGE

TABLE OF CONTENTS

PAGE

STATEMENT PURSUANT TO USCIT RULE 56.1(c)(1) ................................. 2

    I.    The Administrative Determinations Under Review ..................... 2

    II.    Statement Of The Issues ............................................................. 2

STATEMENT OF FACTS ................................................................... 3

    I.    The Section 232 Steel Investigation ............................................. 3

    II.    The President's Proclamations And Their Implementation .......... 4

    III.    Commerce's Administrative Procedures For Requesting Product Exclusions ................................................................................. 6

    IV.    CSI's Exclusion Requests, The Domestic Industry's Responses, And Commerce's Denials ............................................................ 11

        A.    CSI's 2018 Requests ............................................. 12

        B.    CSI's 2020 Requests ............................................. 17

SUMMARY OF ARGUMENT ........................................................... 23

ARGUMENT .................................................................................. 25

    I.    Standard Of Review .................................................................. 25

    II.    CSI Has Not Provided Any Basis To Set Aside Any Specific Final Agency Action ........................................................................... 27

    III.    CSI Has Not Demonstrated That Commerce's Decisions To Deny its Exclusion Requests Were Arbitrary, Capricious, Or Contrary To Law ..................................................................................... 31

        A.    Commerce Reasonably Denied The 2018 Requests ........... 32

1.    USS Was Capable Of Producing Sufficient
        Amounts ................................................................ 32

2.    USS Could Produce In A Timely Manner................. 36

B.    Commerce Reasonably Denied The 2020 Requests ........... 38

1.    USS Could Produce A Sufficient Amount ............... 38

2.    USS Could Deliver In a Timely Manner ................. 40

CONCLUSION............................................................................. 42

TABLE OF AUTHORITIES

PAGE(S)

CASES

*Bowman Transp. Inc. v. Arkansas-Best Freight System*,
419 U.S. 285 (1974) ............................................................... 27

*Brother Indus., Ltd. v. United States*,
1 Ct. Int'l Trade 102 (1980) ................................................. 28

*Canadian Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008)....................................... 25-26

*Dixon Ticonderoga Co. v. United States*,
468 F.3d 1353 (Fed. Cir. 2006)........................................... 26

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................... 27

*Former Emps. of Alcatel Telecommunications Cable v. Herman*,
24 C.I.T. 655 (2000) .............................................................. 27

*Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ........................................................... 26, 27

*NLMK Pennsylvania, LLC v. United States*,
558 F.Supp.3d 1401 (Ct. Int'l Trade 2022)........................ 38

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ............................................................... 27

*Seneca Foods Corp. v. United States*,
663 F. Supp. 3d 1325 (Ct. Int'l Trade 2023).................*passim*

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d. 1312 (Fed. Cir. 2006)........................................... 30

*Transpacific Steel LLC v. United States*,
4 F.4th 1306 (Fed. Cir. 2021) ............................................. 34

*United States v. Great Am. Ins. Co. of New York*,
  738 F.3d 1320 (Fed. Cir. 2013) ....................................................................... 30

*Vicentin S.A.I.C. v. United States*,
  324 F. Supp.3d 1377 (Ct. Int'l Trade 2018) .................................................. 28

STATUTES

5 U.S.C. § 706(2) ....................................................................... 25, 26
19 U.S.C. § 1862 ............................................................................*passim*
19 U.S.C. § 1862(b)(3)(A) .................................................................... 3
19 U.S.C. § 1862(c)(1)(A) .................................................................... 3
28 U.S.C. § 1581(i) .......................................................................... 25
28 U.S.C. § 2640(e) .......................................................................... 25

RULES

USCIT RULE 56.1(c)(1) ...................................................................... 2

REGULATIONS

15 C.F.R. Pt. 705 ........................................................................*passim*

OTHER AUTHORITIES

Adjusting Imports of Steel Into the United States, Proclamation 9705,
  83 Fed. Reg. 11,625 (Mar. 8, 2018) ........................................................*passim*

Adjusting Imports of Steel Into the United States, Proclamation 9740,
  83 Fed. Reg. 20,683 (April 30, 2018) ............................................................ 5

Adjusting Imports of Steel Into the United States, Proclamation 9894,
  84 Fed. Reg. 23,987 (May 23, 2019)................................................................ 5

Requirements for Submissions Requesting Exclusions From the Remedies
  Instituted in Presidential Proclamations Adjusting Imports of Steel Into
  the United States and Adjusting Imports of Aluminum Into the United
  States; and the Filing of Objections to Submitted Exclusion Requests for
  Steel and Aluminum,
  83 Fed. Reg. 12,106 (Dep't of Commerce Mar. 19, 2018)................................. 6

Submissions of Exclusion Requests and Objections to Submitted Requests for
    Steel and Aluminum, 83 Fed. Reg. 46,026 (Dep't of Commerce Sept. 11,
    2018) ................................................................................................. 6, 7, 40

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

———————————————————————
                                                    )
CALIFORNIA STEEL INDUSTRIES,        )
INC.,                                               )
                                                    )
     Plaintiff,                              )          **PUBLIC**
                                                    )
     v.                                          )          Court No. 21-cv-00015
                                                    )
UNITED STATES,                              )
                                                    )
     Defendant.                            )
———————————————————————)

<u>DEFENDANT'S RESPONSE TO PLAINTIFF'S REMAND COMMENTS</u>

Pursuant to Rule 56.1 of the Rules of this Court, defendant, the United States, respectfully submits this response to the remand comments filed by plaintiff, California Steel Industries, Inc. (CSI).  CSI challenges the Department of Commerce's decisions to deny 193 requests for exclusion from import measures imposed on certain steel articles by the President under Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, as amended (Section 232).  Commerce weighed the record evidence, including CSI's submissions and the objections and supporting evidence submitted by objector, United States Steel Corp. (USS) to conclude that CSI's 193 requests each failed to satisfy the regulatory criteria for granting an exclusion.  The evidence established that: (1) USS manufactures steel slab identical to that

subject to the requests; (2) CSI was unlikely to purchase all of its requirements of steel slab for rolling in the United States from the domestic industry despite availability; and (3) USS was capable of meeting CSI's requirements in a timely manner.  Commerce's decisions were reasonable and, thus, the Court should enter judgment for the United States.

Moreover, CSI attempts to conflate the separate and distinct administrative records for 193 determinations such that it can discard the domestic industry entirely and obtain duty free treatment for all of its steel needs, even if domestic supply were reasonably available covering 99 percent of its requirements.  The Court should reject this attempt at an end run around the President's national security measures.

<u>STATEMENT PURSUANT TO USCIT RULE 56.1(c)(1)</u>

I.    <u>The Administrative Determinations Under Review</u>

The administrative determinations under review are Commerce's denials on remand of CSI's 193 requests to exclude certain imports of semi-finished, commodity-grade steel slab from the Section 232 national security duties on steel articles.

II.    <u>Statement Of The Issues</u>

1.  Whether CSI has demonstrated that Commerce's decisions denying CSI's requests to exclude imports of semi-finished, commodity-grade steel

2

slab from the President's national security tariffs were arbitrary, capricious, or contrary to law.

2.  Whether CSI has met its burden of proof to establish that any single challenged final agency action was arbitrary and capricious.

<u>STATEMENT OF FACTS</u>

I.    <u>The Section 232 Steel Investigation</u>

Section 232 authorizes the President to adjust imports of an article and its derivatives if the President concurs with a finding by the Secretary of Commerce (the Secretary) that such imports threaten to impair the national security. *See generally* 19 U.S.C. § 1862.

Upon receiving a report from the Secretary finding that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President is authorized, if the President concurs with the Secretary's findings, to "adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).

In his investigation, Secretary found that steel imports are "weakening {the United States'} internal economy" and "threaten to impair the national security as defined in Section 232." U.S. DEP'T OF COMMERCE, THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY (Jan. 11, 2018), at 5.  The

Secretary found that the availability of steel from a healthy domestic industry is important for national defense and to support critical infrastructure needs, and that the current quantity of imports, due to substantial and sustained global overcapacity, adversely affected the domestic steel industry. *Id.* at 23-41.

In light of these findings, the Secretary recommended that "the President take immediate action by adjusting the level of imports through quotas or tariffs on steel imported into the United States {so as to} keep the U.S. Steel industry financially viable and able to meet U.S. national security needs." *Id.* at 58. The Secretary also recommended a process by which certain products could be excluded from the import measures, after a request from affected United States parties demonstrating a lack of sufficient United States production capacity of comparable products, or based on specific national security considerations. *Id.* at 61.

II.    The President's Proclamations And Their Implementation

After considering the Secretary's report, the President issued *Proclamation 9705,* in which he concurred with the Secretary's finding that steel articles are being imported in such quantities and under such circumstances as to threaten to impair the national security of the United States, and announced measures on "adjusting imports of steel." *Adjusting Imports of Steel Into the United States*, *Proclamation 9705*, 83 Fed. Reg.

11,625 (Mar. 8, 2018). The President established a 25 percent tariff on

imports of certain steel articles, effective March 23, 2018, from all countries

except Canada and Mexico. *Id.* Clauses (1)-(2). The exclusion of Canada and

Mexico from the Section 232 remedy expired on June 1, 2018, and, thus, steel

from those countries became subject to a 25 percent tariff as of that date.

*Adjusting Imports of Steel Into the United States*, *Proclamation 9740*, 83

Fed. Reg. 20,683 (April 30, 2018).[1]

Simultaneously with imposing the tariffs, the President authorized the

Secretary of Commerce to provide relief from the tariffs for products

determined not to be produced in the United States in a sufficient and

reasonably available amount or of a satisfactory quality or based upon

specific national security considerations. *Proclamation 9705*, Cl. (3). The

President explained that "relief shall be provided for a steel article only after

a request for exclusion is made by a directly affected party located in the

United States." *Id.* The President instructed Commerce to issue procedures

---

[1] Approximately one year later, the President proclaimed that discussions with Canada and Mexico resulted in satisfactory alternative means to address the threatened impairment of the national security posed by steel imports from those countries and, therefore, again excluded Canada and Mexico from the tariffs imposed in *Proclamation 9705* on a long-term basis. *Adjusting Imports of Steel Into the United States*, *Proclamation 9894*, 84 Fed. Reg. 23,987 (May 23, 2019).

for the requests for exclusion within 10 days after *Proclamation 9705* was issued.  *Id.* Cl. (4).

III.  <u>Commerce's Administrative Procedures For Requesting Product Exclusions</u>

In March 2018, Commerce promulgated an interim final rule, establishing the exclusion process envisioned in *Proclamation 9705*. *Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12,106 (Dep't of Commerce Mar. 19, 2018) (*March 2018 IFR*), codified at 15 C.F.R. Pt. 705, Supp. 1[2]; *see also Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46,026 (Dep't of Commerce Sept. 11, 2018) (*September 2018 IFR*).

Under its regulations, only directly affected individuals or organizations (*e.g.*, construction, manufacturing, or supplying steel product to users) located in the United States may submit an exclusion request.  *Id.* § (c)(1).  Commerce will approve exclusions on a product-specific basis, and the

---

[2] CSI's exclusion requests were submitted in 2018 and 2020.  At all relevant times, Commerce relied on the version of the regulations in effect at the time those requests were submitted and decided.

approvals are generally limited to the individual or organization that submitted the request. *Id.* § (c)(2).

Exclusion requestors must complete and submit a fillable form available on Commerce's website, *id.* § (b), as well as specify the business activities in the United States with which they are engaged that qualify the individual or organization to be directly affected and thus eligible to submit a request, *id.* § (c)(5). "The request should clearly identify, and provide support for, the basis upon which the exclusion is sought." *Id.*

The fillable form required requestors to supply specific factual information, including: (1) the product type and class for which the exclusion is requested; (2) the quantity of product required (stated in kilograms) under a one-year exclusion; (3) estimates of the number of days required to take delivery of, manufacture, and ship the product covered by the request; (4) a full description of the physical properties and chemical composition of the product the requestor seeks to import; (5) any standards organizations that have set specifications for the product; (6) the application for the product; (7) why similar products manufactured in the United States are not suitable; and (8) domestic product availability information. *See, e.g.*, Appx6671-77.

Additionally, requestors must submit separate requests for each distinct product based on physical properties:

7

> Separate exclusion requests must be submitted for steel products with chemistry by percentage breakdown by weight, metallurgical properties, surface quality (*e.g.*, galvanized, coated), and distinct critical dimensions (e.g., 0.25-inch rebar, 0.5- inch rebar, 0.5-inch sheet, or 0.75 sheet) covered by a common HTSUS subheading.

15 C.F.R. Pt. 705, Supp. 1, § (c)(2).

Commerce reviews each request to determine whether an article described in the request meets one of three criteria: (1) the article is not produced in the United States in a sufficient and reasonably available amount, (2) the article is not produced in the United States in a satisfactory quality, or (3) specific national security considerations. *Id.* § (c)(6).

Not produced in the United States in a sufficient and reasonably available amount means that the amount "that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities." *Id.* § (c)(6)(i). "Immediately" means whether a product is "*currently being produced or could be produced* 'within eight weeks' in the amount needed in the {requestor's} business activities" *Id.* (emphasis added).

Not produced in the United States in a satisfactory quality does not mean the steel "needs to be identical, but it does need to be equivalent as a substitute product." *Id.* § (c)(6)(ii).

8

Any individual or organization that domestically manufacturers steel articles may file objections to exclusion requests. *Id.* § (d)(1). An objection "should clearly identify, and provide support for, its opposition to the proposed exclusion." *Id.* § (d)(4). The fillable form instructed objectors to: (1) indicate whether the objector currently manufactures the product or is capable of immediately manufacturing the product; (2) explain the time period within which the objector can produce the product, if it does not currently manufacture the product; (3) state whether the objector manufactures, or can immediately manufacture, a substitute product; (4) discuss the suitability of the objector's product compared to that identified in the request; (5) provide a full technical description of the physical properties and chemical composition of the product the objector manufactures relative to specifications cited in the request; (6) state what percentage of the total product tonnage requirement covered by the request that the objector can manufacture on a timely basis; and (7) the number of days required to ship, manufacture, and deliver the product. *See, e.g.*, Appx6718-22.

Requestors may also submit rebuttals, and objectors may submit surrebuttals. *Id.* § (f)-(g). Because information provided in the submissions is made available to the public, the regulations state that information not subject to public disclosure should not be submitted. *Id.* § (b)(5)(ii).

9

Requestors and objectors may submit confidential or proprietary business information (CBI) to Commerce outside the public portal.  *Id.* § (b)(5)(iii).

"Commerce reviews an exclusion request based on the information included in the exclusion request, any objections to an exclusion request, any rebuttals to the objections made by an individual or organization that submitted the exclusion request, and any surrebuttals."  *Id.* § (c)(6)(i).

For exclusion requests that receive no objections, Commerce will post a decision granting the request if it identifies no national security concerns.  *Id.* § (h)(2)(ii).  If Commerce "denies an exclusion request based on a representation made by an objector, which later is determined to be inaccurate (*e.g.*, if the objector was not able to meet the requirement of being able to 'immediately' supply the steel that was included in a denied exclusion request in the quantity needed), the requester may submit a new exclusion request that refers back to the original denied exclusion request and explains that the objector was not able to supply the steel."  *Id.* § (c)(6)(i).

Approved exclusions will be effective five business days after publication of Commerce's response granting an exclusion, and, on that date, "the requester will be able to rely upon the approved exclusion request in calculating the duties owed on the product imported in accordance with the terms listed in the approved exclusion request."  *Id.* § (h)(2)(iii)(A).

Commerce further directed that "{e}xclusions will generally be approved for one year." *Id.* § (h)(2)(iv).

IV.    CSI's Exclusion Requests, The Domestic Industry's Responses, And Commerce's Denials

In 2018 and 2020, CSI applied for 193 exclusions from the President's import measures imposed on certain steel articles under Section 232. Broadly speaking, CSI sought exclusions for semi-finished, commodity grade steel slab so that it could import those products rather than acquire more expensive domestic steel slab. CSI is not a steelmaker. It is a "slab converter" or "re-roller," meaning that it purchases steel and rolls it for resale. Mot. at 4. CSI contends that, to run profitably, it requires approximately 2.3 million MT[3] of steel slab to convert at its facility. *Id.* This represents a capacity utilization of 85 percent. Appx6685. Even though CSI had been sourcing some if its steel slab from USS at the time of its 2018 exclusion requests and had been in negotiations with USS to provide more than the total volume of its 2020 requests, CSI sought exclusions from all tariffs in both years, which would allow it to import all of its steel slab duty free rather than continuing to purchase any American steel.

---

[3]  A metric ton (MT) equals 1.1 net tons (NT), and one NT equals .91 MT.

A.    <u>CSI's 2018 Requests</u>

Despite its stated capacity 3 million net tons of slab per year,

Appx6678, CSI submitted 170 exclusion requests in March 2018, seeking an

aggregate exclusion from duties for about 33 net tons of slab, over 11 times

its total capacity.  Appx6736.  CSI ultimately reduced its request to 2.3

million metric tons, representing 85 percent of its rolling capacity – and

about twice its actual production in the previous year.  Appx6750.  Each

separate request identified the physical characteristics of the subject product,

including chemical composition and dimensions.  Appx6672-74.  CSI noted

that its requests covered its "anticipated slab needs."  Appx6679.  CSI

contended that the domestic industry refused to sell slab to it but stated that

cost was a major factor in its business decision to remain dependent,

Appx6766, on imported slab:

> the few remaining integrated mills in the U.S. that
> have slab production capability for their own use are
> located along the Mississippi River or further East.
> Even if those mills wanted to sell slabs to Western
> slab converters, including CSI, transportation costs
> pose a significant hurdle to providing a good business
> opportunity for any of the parties, as rail is much
> more expensive than ocean transport.

Appx6680.

Rather than purchasing American steel, CSI stated that its "main

suppliers in recent years have been Brazil, Japan and Mexico."  Appx6679.

12

CSI also acknowledged purchasing "slabs from {its} two shareholders (JFE Steel Corporation of Japan and Vale S.A. of Brazil)." *Id.*

USS (among others) objected to each of CSI's 170 requests, explaining that it "produces the entire spectrum of grades and dimensions of steel slabs identified in CSI's requests and has significant excess production capacity and is able to meet 100% of the volume cited in CSI's exclusion request." Appx6725. USS further noted that steel from Brazil, although subject to a quota, was exempt from the Section 232 import measures. Appx6726.

In its rebuttal, CSI stated that it had "made 18 inquiries of domestic steel slab producers. In 13 of those cases, the supplier communicated that there were no slabs available. In two of those cases, the parties were unable to agree on price. A slab purchase deal was reached in only three of the 18 inquiries." Appx6764. It again admitted that price was a key consideration in deciding whether to purchase American steel:

> it has *not proven to be good business* for U.S. Steel to sell much slab to CSI, or *for CSI to buy much slab from U.S. Steel*. This is in large part due to the geographic distance and high transportation costs between CSI and U.S. Steel's plants, which are located along the Mississippi River and eastward. U.S. Steel can make a higher return using its slabs to minimize its excess rolling capacity. And CSI is a healthier company by *avoiding the high cost of buying from U.S. Steel*.

13

*Id.* (emphasis added); *see also* Appx6765 (noting that CSI "would welcome additional slab production in the U.S. to provide a meaningful (volume and *price*) alternative to imported slab") (emphasis added).

In its surrebuttal, USS responded to CSI's claim that USS was only able to provide a small percentage of its total slab requirements, noting that CSI had declined to purchase additional steel from USS, despite availability:

> entered into a multi-month contractual agreement for supply of slabs from U. S. Steel, but imply that they were unable to secure the commitment for more than a small portion of their overall projected tonnage demand. U.S. Steel remains open to increasing the ongoing, monthly supply to CSI, and did not limit the contractual volume. Rather, the stated monthly volume range of 10,000-15,000 net tons was defined by CSI as the amount they were willing to commit to buy. Further, to date for the late third and fourth quarters 2018, CSI has only placed orders for the absolute minimum monthly volume, despite U.S. Steel's urging and solicitation to increase the ordered amounts to the maximum of the agreed range and beyond through incremental sales or an increase to the agreement.

Appx6782. USS further explained, contrary to CSI's speculation, USS's sales to CSI were "good business" from USS's perspective. *Id.* (quoting Appx6764).

USS also provided a confidential attachment setting forth its [

]. Appx6787. There, it noted that it had "[

]" *Id.* USS also indicated that its slab making facilities were utilizing

[    ] percent of their total capacity, and that manufacture time for its products

was [                     . *Id.* And USS's excess capacity [

                                        ]. *Id.*

After the Court granted our request for a voluntary remand, ECF No.

86, Commerce addressed all 170 requests anew, concluding that CSI had not

met its burden under the regulation. The decisionmaker concurred with the

International Trade Administration's (ITA) recommendation that the

exclusion be denied because "{a}t least one objector meets the {regulation's}

quality, quantity, and timeliness criteria." Appx1408.

First, the ITA reviewed USS's submissions and concluded that "the

evidence included in U.S. Steel's objection and certified statements indicate

that U.S. Steel can meet a thickness, width, and length within the range of

the requested product." *Id.* The ITA further noted that CSI did not dispute

USS's representations regarding its ability to produce an identical product.

Appx1409. Similarly, CSI had identified U.S. Steel as a qualified supplier of

semifinished slab in its exclusion requests and acknowledges CSI currently

purchases the same subject slab from USS. *Id.*

Second, with respect to the "sufficient and reasonably available amount" analysis, ITA explained that the evidence established that CSI had executed a "multi-month contract with U.S. Steel which meets 8 to 12 percent of its current volume requirements. U.S. Steel submitted a surrebuttal and accompanying attachment in which U.S. Steel confirms that it has a contractual agreement to supply slabs to CSI, and further notes that it is open to producing additional volume and that the contracted volume represents the maximum that CSI would commit to buy." *Id.* Commerce weighed this evidence and found "it appropriate to give greater weight to U.S. Steel's statements because U.S. Steel is in the best position to know its own production schedule and abilities to produce the requested product." *Id.* ITA further noted that CSI's statement that it is "a healthier company by avoiding the high cost of buying from U.S. Steel," *id.* (quoting Appx6764), further supported the conclusion that USS was capable of providing and desired to sell more steel than the minimum contractual amount.

Additionally, with respect to the timeliness criterion, Commerce concluded that USS could timely produce subject slab. Commerce noted that the relevant test under the regulation is "whether a product is currently being produced or could be produced 'within eight weeks' in the amount needed in the business activities" of the requestor. Appx1410 (quoting 15 CFR Part 705, Suppl. 1 at ¶ (c)(6)(i) (2018)). "CSI d{id} not contest U.S.

Steel's manufacturing time, and challenge{d} only U.S. Steel's delivery times and production capacity." *Id.* As a result, ITA found that "U.S. Steel produces or could produce the product within eight weeks." *Id.* And moreover, "even if delivery time and production capacity were relevant to ITA's analysis, U.S. Steel submitted in its surrebuttal non-contemporaneous documentation indicating that it could feasibly produce and deliver the requested quantity within eight weeks, and that it possesses additional capacity to increase its production." *Id.*

B.    <u>CSI's 2020 Requests</u>

CSI submitted 23 additional exclusion requests covering an aggregate of 425,000 MT of steel slab from Japan. Mot. at 14. In its 2020 requests, CSI noted that it requires about 1.5 MT of steel slab annually, to provide end products to its customers." Appx22880. CSI contended that there is insufficient domestic slab to meet its needs and that "total slab production capacity in the U.S. is just 29.7 million net tons, *much of what is not currently in use*." Appx22882 (emphasis added). CSI claimed that it "regularly inquires of domestic mills about slab availability, with little success. Distance, freight costs and their own competing business objectives have simply made it an unattractive proposition for the Eastern U.S. mills to routinely sell their limited available slabs to us." Appx22883.

CSI acknowledged that it had purchased steel slabs from USS: "The total amount of slab sales provided by U.S. Steel from August 2018 through October 2019 was less than 25% of CSI's total slab needs." Appx22884. But CSI contended that a "significant portion of the U.S. Steel slabs were delivered more than 8 weeks from the purchase order date, so those deliveries did not meet domestic lead time requirements of Section 232." Appx22884-85.

In its opposition, USS explained that, since imposition of the Section 2332 tariff in 2018, "market conditions and continued high levels of imports forced U. S. Steel to announce the idling . . . blast furnaces account for more than 683,000 MT of unused steelmaking capacity *each month* and can be restarted if demand for domestically produced steel products increases." Appx22912 (emphasis in original); *id.* n.3 (identifying facilities closed during the last year and noting that "the referenced blast furnaces account for more than 8.2 million MT of unused and readily available raw steel production capacity").

USS further explained that it had "never established a maximum slab quantity available" to CSI, and that it "has consistently sold slabs on the commercial market because U. S. Steel's raw steelmaking (*i.e.*, slab-making) capacity exceeds its internal demand for semi-finished steel slab." Appx22914. Rather, according to USS, "CSI has expressly declined to buy

the full volume of slab offered by U.S. Steel to date in 2020." *Id.*  USS
further noted that its "2019 commercial slab sales greatly exceeded the
unsupported figure cited in the Exclusion Request." *Id.*  USS also explained
that, in "August 2018, CSI entered into a one-year slab supply contract with
U.S. Steel.  Because CSI—not U.S. Steel—declined to extend this contract,
all subsequent slab sales have been made as spot sales, which U. S. Steel
has continued to consistently offer to" CSI.  *Id.*

In responding to CSI's contention that delivery times exceeded the
eight-week regulatory timeframe, in negotiating sales with USS, "CSI
repeatedly indicated that most shipments were for stock and, as such, did
not require priority delivery (*e.g.*, delivery in less than eight weeks).  *Id.*
USS likewise explained that "Commerce's eight-week definition of
'immediate availability' exists for the limited purpose of evaluating Section
232 exclusion requests and does not govern the specific delivery terms
negotiated and agreed to in actual purchase contracts and spot sales."
Appx22914-15.

In its rebuttal, CSI contended that USS cannot supply 100 percent of
CSI's requirement.  CSI acknowledged that "{s}upply from U.S. Steel did
increase dramatically following the Section 232 tariffs and quota limitations
on slabs." Appx22931.  But CSI argued that this was "still not nearly
enough to take care of CSI's requirements," *id.*, as opposed to the aggregate

19

volume requested in its 2020 exclusion requests.  CSI admitted that "total offers of slab (contract and spot) from U.S. Steel in 2019 were 324,400 net tons" (297,400 MT) and that USS "would ideally like to supply CSI in the range of 20,000 to 40,000 net tons a month," which adds up to almost 220,000 to 440,000 MT per year.  Appx22931.  Although CSI provided email communications with                    ] regarding negotiations for [

], Appx22938, it did not provide any communications with USS regarding the parties' course of dealing that might contradict USS's certification that it could supply 100 percent of CSI's requirements or shed light on USS's alleged inability to produce sufficient volume of steel slab.

CSI also did not contest USS's statements regarding timeliness. Appx22930-33.

In its surrebuttal, USS provided detailed information regarding its slab sales and negotiations with CSI.  There, USS "confirm{ed} that it has the current open capacity to supply the volume defined in this Exclusion Request, any pending repeat exclusion requests for the exact same slab dimensions, and up to 100 percent of CSI's total current slab needs." Appx22949.  USS further provided a confidential attachment detailing its slab sales from 2018 through 2020.  *Id.* (citing Appx22956-57).  The listing of sales confirmed that CSI "understate{d} the volume of slab CSI purchased from U.S. Steel in 2019 and contradicts CSI's unsupported assertion that

U.S. Steel is unwilling to supply more than 40,000 net tons of slab per month." *Id.* The table "also demonstrates that CSI increased the volume of slab purchased from U.S. Steel by more than 190 percent from 108,871 MT in 2018 to 316,598 MT in 2019 and continues to accept deliveries from" USS. *Id.* Moreover, USS reiterated that "CSI passed on offered volumes in the fourth quarter of 2019 in favor of imports from Brazil." *Id.*; *see also* Appx22958 ([                    ] emails [

                                    ]).

The decisionmaker reviewed and concurred with ITA's recommendation that CSI had not met its regulatory burden for each of its 2020 exclusion requests. Appx1011-18.

First, Commerce reviewed the parties' submissions and concluded that USS can manufacture the requested products. Appx1014-16.

Second, with respect to "sufficient and reasonably available amount," Commerce explained that the evidence established that USS could produce the aggregate amount of the requests. The agency noted that, "{w}hile CSI also submitted a confidential attachment to its rebuttals, there is no information in CSI's confidential attachment supporting CSI's claim that U.S. Steel cannot produce 100 percent of the requested volume. In its objection to each request, U.S. Steel certifies that it can produce within eight weeks 100 percent of the requested volume." Appx1016. Commerce

further noted that the parties' course of dealing supported its finding. Specifically, CSI had contended that "that U.S. Steel offered a volume of 20,000 to 40,000 net tons per month," the higher of which exceeded the aggregate request amount on an annual basis. Similarly, Commerce noted "CSI does not address or rebut U.S. Steel's claims that it was CSI's decision not to extend its contract with U.S. Steel into 2020, nor to purchase via spot sales from U.S. Steel in late 2019." Appx1017. Accordingly, the agency weighed the totality of the evidence and found USS's proffer more credible:

> based on the totality of evidence provided by both CSI and U.S. Steel on the record of these exclusion requests, ITA finds it appropriate to give greater weight to U.S. Steel's statements here, which appear credible on their face and in light of their certifications, because U.S. Steel is in a better position than CSI to know the limits of its own production schedule and ability to produce the full volume of the requested product.

*Id.* Commerce further explained that CSI itself had admitted:

> its reasons for limiting domestic purchases: "the few remaining integrated mills in the U.S. that have slab production capability for their own use are located along the Mississippi River or further east. Even if those mills wanted to sell slabs to Western slab converters, including CSI, transportation costs pose a significant hurdle to providing a good business opportunity for any of the parties, as rail is much more expensive than ocean transport."

*Id.* (quoting Appx22881).

Additionally, with respect to the timeliness criterion, Commerce explained that, although delivery time for about half of USS's shipments to CSI took longer than eight weeks, CSI repeatedly indicated that most shipments were for stock and, as such, did not require priority delivery. *Id.* Furthermore, based on CSI's own statements, more than 50% of past deliveries have occurred within the 8-week time frame, illustrating that U.S. Steel produces or could produce requested product within the required time frame. Moreover, there is nothing in CSI's documentation that demonstrates that current and future production and deliveries are impacted by any past delivery issues." *Id.* Accordingly, Commerce weighed the totality of the evidence and found that CSI failed to establish that the subject steel slab could not be produced within eight weeks.

## SUMMARY OF ARGUMENT

The Court should sustain Commerce's decisions to deny CSI's exclusion requests. Commerce complied with its regulation and its decisions were reasonable in light of the totality of evidence presented by CSI and USS. Commerce denied the requests because the evidence established that the exact products CSI sought were domestically available in sufficient quantities. Rather than identifying any fault in Commerce's analysis, CSI ignores vast swaths of record evidence demonstrating USS's ability and availability to sell American steel slab to CSI.

First and foremost, CSI's all-or-nothing approach is fatal to its challenges to 193 separate final agency actions. CSI has elected to treat all 170 of its 2018 exclusion requests and all 23 of its 2020 requests as only two single final agency actions, such that, even if the domestic industry could timely provide 99 percent of its aggregate requested volumes, then all 100 percent of that volume must enter duty free. Contrary to this theme, each request stands on its own, and CSI does not identify a single request for which USS is incapable of timely providing an identical quantity of steel slab. CSI's approach would reward it with duty-free treatment for *all* of its imports so long as it discards all of its available American suppliers. The Court is reviewing 170 final agency actions from 2018 and 23 additional individual final agency actions from 2020. CSI does not identify a single final agency action for which CSI has established the basis for an exclusion under the regulation. And the fact that CSI elected to aggregate 193 separate determinations into a single action should not affect the Court's APA analysis for any individual final agency action.

Moreover, with respect to the 170 individual requests submitted in 2018, USS proffered evidence demonstrating that it possessed sufficient untapped capacity to manufacture the entire 2.3 million tons of steel slab for which CSI requested exclusions. Furthermore, CSI did not contest that USS can supply identical merchandise in a timely manner. Indeed, as CSI

candidly admits, the real reason that CSI would not purchase more slab from USS is that CSI understands that it is not "good business" for it to buy much American steel.

And CSI's challenges to the 23 exclusion requests from 2020 fare no better. Indeed, USS was supplying CSI with steel slab up to the time of those requests, and it was USS that elected to terminate discussions for a volume that could have more than covered the 425,000 MT for which CSI requested exclusions. CSI's timeliness contentions also lack merit. The record shows that USS was able to produce within eight weeks, and the parties' unrebutted course of dealing shows that they had agreed to many of the longer delivery times that CSI holds up as supporting untimeliness.

ARGUMENT

I.    Standard Of Review

In a civil action brought under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the matter as provided in section 706 of title 5." 28 U.S.C. § 2640(e). "When reviewing a decision of the Court of International Trade in a suit brought pursuant to 28 U.S.C. § 1581(i), {the court} appl{ies} the standard of review set forth by the Administrative Procedure Act, and will 'hold unlawful and set aside {agency} action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Canadian Lumber Trade All. v.*

*United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008) (quoting 5 U.S.C. §

706(2)) (citing *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1354

(Fed. Cir. 2006)).

"The scope of review under the 'arbitrary and capricious' standard is

narrow and a court is not to substitute its judgment for that of the agency."

*Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43

(1983). Commerce "must examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'" *Id.* (citations omitted).

"The arbitrary and capricious standard of review is {also} narrower

than the substantial evidence standard, and the court will therefore remand

{Commerce's} … determination only if it finds that 'the agency has relied on

factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product

of agency expertise.'" *Former Emps. of Alcatel Telecommunications Cable v.

Herman*, 24 C.I.T. 655, 658–59 (2000) (quoting *Motor Vehicle Mfr.'s Ass'n*,

463 U.S. at 43).

While the Court "'{m}ay not supply a reasoned basis for the agency's

action that the agency itself has not given,' {it} will, however, 'uphold a

decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 285, 286 (1974)); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (describing the arbitrary and capricious standard of review as "narrow").

I.    CSI Has Not Provided Any Basis To Set Aside Any Specific Final Agency Action

CSI's all-or-nothing approach is fatal to its challenges to 193 separate final agency actions. CSI has elected to treat all 170 of its 2018 exclusion requests and all 23 of its 2020 requests as only two single final agency actions, such that, even if the domestic industry could timely provide 99 percent of its aggregate requested volumes, then all 100 percent of that volume must enter duty free. In essence, CSI has acknowledged that USS can provide some if its requirements but it asks the Court to allow it to abandon all possible domestic purchases in favor of duty-free imports. *See* Mot. at 37-38 (seeking Court ordered remand that Commerce grant all of its exclusion requests). That is inconsistent with the APA, Commerce's regulatory framework, and the President's proclamation.

First, each individual determination was a single final agency action, and there is no basis to "conflate" their separate administrative records. Cf.

*Vicentin S.A.I.C. v. United States*, 324 F. Supp.3d 1377, 1381 (Ct. Int'l Trade 2018) (finding consolidation unwarranted because, in addition to the fact that not all parties to the cases were identical, the parties could "inadvertently conflate" separate and distinct records); *cf. Brother Indus., Ltd. v. United States*, 1 Ct. Int'l Trade 102, 103-04 (1980) (consolidating cases because "{t}he court will be concerned with only one administrative record in both actions.").

Second, as explained above, the regulation requires requestors to submit a separate request for each distinct product:

> Separate exclusion requests must be submitted for steel products with chemistry by percentage breakdown by weight, metallurgical properties, surface quality (*e.g.*, galvanized, coated), and distinct critical dimensions (*e.g.*, 0.25-inch rebar, 0.5- inch rebar, 0.5-inch sheet, or 0.75 sheet) covered by a common HTSUS subheading.

15 C.F.R. Pt. 705, Supp. 1, § (c)(2). CSI does not challenge this regulatory requirement and, nor does it contest that its challenge covers 193 separate final agency actions under the APA, each with its own administrative record. *See* Compl. ¶¶ 31-32. Nor can it. The President was clear that Commerce should grant exclusions on an article-by-article basis: "If the Secretary determines that *a particular steel article* should be excluded, the Secretary shall, upon publishing a notice of such determination in the Federal Register, notify Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the duties

described in clause 2 of this proclamation." *Proclamation 9705*, 83 Fed. Reg. at 11,627.

And CSI does not contest that USS had capacity to produce enough steel to cover any individual request. In its 2018 requests, CSI admitted that it had "request{ed} exclusions collectively for much more steel slab than we needed, due to the process requiring us to file separately for each slab dimension rather than a range of dimensions." Appx6740. For example, in its example exclusion from 2018, CSI identified a volume of 66,000 MT, Appx6671, despite average annual consumption of that article from 2015-2017 of about 22,000 MT. Appx6672. CSI later reduced the aggregate of its 2018 requests by over 90 percent. [4] Appx6765. Similarly, in its selected 2020 exclusion request, CSI sought to exclude 20,000 MT from the Section 232 import measure. Appx22783.

At the time of the 2018 and 2020 requests CSI was already sourcing or could have sourced far more than enough steel from USS to cover its grossly inflated 2018 request and its 2020 request. Appx6787 (2018); Appx22959 (2020). Indeed, in 2018, CSI requested exclusions for almost two times its actual production in 2017. Appx6750. And despite these facts, CSI

---

[4] One would presume that, although "CSI filed for tariff exclusions for more slabs than it needed" in 2018, Appx6765, the relevant proportions of the overstated requests reflect CSI's anticipated usage.

represented to Commerce that "100%" "of total steel product covered under this Exclusion Request {was} not available from steel manufacturers in the United States." Appx6671 (2018); Appx22874 (2020). Similarly, for each request, CSI discussed only its purported aggregate requirement of all types of steel. *See* Appx6750; Appx22879. Accordingly, the Court should also sustain each of Commerce's 193 determinations due to CSI's failure of proof.

Similarly, CSI has waived any contention that it is entitled to duty-free treatment for some proportion of its imports, having advanced an all-or-nothing gambit. "It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived." *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d. 1312, 1319 (Fed. Cir. 2006) ("{o}ur law is well established that arguments not raised in the opening brief are waived."). In sum, CSI set its own bar and cannot now complain that it is too high.

And third, CSI's approach creates the absurd result of decreasing United States capacity utilization in contravention of the President's goal to "enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production." *Proclamation 9705*, 83 Fed. Reg. at 11,625. By seeking exclusions on its entire anticipated use in 2018 and more

than domestic purchases in 2020, CSI seeks to substitute imports for American steel manufactured by a domestic steel maker who *Proclamation 9705* is meant to protect.

## II.    CSI Has Not Demonstrated That Commerce's Decisions To Deny its Exclusion Requests Were Arbitrary, Capricious, Or Contrary To Law

This case covers 193 individual exclusion requests.  Each of the 193 final agency actions themselves can be analyzed in two general categories.[5] The first category covers 170 individual exclusion requests that CSI filed in 2018 for various semi-finished steel slab articles.  The total volume subject to the requests was 2.3 million metric tons, which CSI represented was 85 percent of its rolling capacity – although two times the last year's usage. Commerce denied those requests because it found that identical merchandise was readily available in the domestic market and that USS had, in fact, sold identical merchandise to CSI and proffered evidence that it possessed capacity sufficient to produce the entire requested volume.  The second category covers 23 individual exclusion requests that CSI filed in 2020 for the same slab that CSI filed in 2018.  Commerce denied those requests because USS had continued to sell identical slab to CSI, and the evidence established that CSI had cut off negotiations over slab purchases that could have

---

[5] For the most part, we agree with CSI that the records associated with each "tranche" of requests are similar.  Mot. at 4.  For the sake of efficiency, we cite the same two administrative records as CSI.

exceeded the total volume of its 2020 exclusion requests.  Commerce also weighed CSI's claim that USS could not deliver merchandise of a sufficient quality in a timely manner against USS's evidence that USS could produce within eight weeks, concluding that USS could timely manufacture the requested slab.

### A.    Commerce Reasonably Denied The 2018 Requests

Commerce weighed all of the evidence and concluded that CSI had failed to establish any of the three criteria that could warrant an exclusion from the Section 232 import measures.  As previously explained, Commerce "will review each exclusion request to determine whether an article described in an exclusion request meets any of the following three criteria: the article is {1} not produced in the United States in a sufficient and reasonably available amount, {2} is not produced in the United States in a satisfactory quality, or {3} for specific national security considerations."  15 C.F.R. Part 705, Suppl. 1 at ¶ (c)(6)(i)-(iii) (2018).  CSI takes issue only with the first prong of this analysis, contending that the domestic industry cannot produce a sufficient volume to supply its requirements and that the industry could not produce that amount in a timely manner.  Mot. at 21-28.

### 1.    USS Was Capable Of Producing Sufficient Amounts

CSI contends at pages 22-27 of its brief that Commerce "ignored" evidence that USS could not produce and sell to it all 2.3 million MT covered

by its 2018 exclusion requests.  CSI is mistaken.  Commerce weighed *all* of
the record evidence and found USS's sworn certification that it could produce
100 percent of the amount of each individual request to be more credible than
the purportedly countervailing evidence that CSI provided.  Appx1017.
Indeed, fatally, CSI fails to refute evidence that: (1) CSI refused to even ask
for more than a small percentage of its requirements; (2) CSI elected to
purchase less than contractual amounts from USS; and (3) USS had
sufficient excess capacity to supply all of CSI's requested amounts.

First, CSI contends that the fact that USS was supplying it with seven
percent of its total 2.3 million MT aggregate volume (spread over 170
requests) indicated that USS was unable to provide more steel.  *Id.* at 22.
However, USS explained that it had "




]" Appx6787
(emphasis added).  CSI does not provide any evidence regarding that
contract, for example communications addressing the negotiation history and
amounts of steel requested.  Similarly, USS stated that [


].  *Id.*  The whole point of the

President's Section 232 tariff is to increase and maintain domestic capacity utilization to at least 80 percent. *See, e.g., Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1313 (Fed. Cir. 2021).

USS further dispelled the contention at pages 22-24 of CSI's brief that USS would not sell additional American steel to CSI because USS would use any available capacity only to increase its own rolling output. USS's evidence demonstrated that it was selling significant volumes of steel slab to numerous customers at the time. *Id.* And it was CSI who refused to purchase the maximum amount available in its supply contract with USS. *Id.*[6] Similarly, although USS did not sell 2.3 million MT of slab, Mot. at 24-25, it possessed [

]. Appx6787. CSI never addresses this fact and thus concedes it. Commerce explicitly weighed this evidence in conjunction with other evidence to determine that USS could produce a sufficient volume of steel slab. Appx1409-10.

Especially telling is the fact that CSI nowhere acknowledges its admissions that "it has not proven to be good business for . . . for CSI to buy

---

[6] The sales contract [                    ] the 66,000 MT identified in the example exclusion request, Appx6671, and CSI later reduced the aggregate volume of its 2018 requests to less than 10 percent of the original total. Appx6765 (acknowledging that "CSI filed for tariff exclusions for more slabs than it needed.").

much slab from U.S. Steel," or that "CSI is a healthier company by avoiding the high cost of buying from U.S. Steel." Appx6764. However, Commerce noted that, while the admissions enlighten the reason for CSI electing to limit domestic purchases, "CSI's economic reasons for not purchasing more of the requested product from U.S. Steel are not among the regulatory criteria that form part of ITA's analysis for granting or denying a request." Appx1410.

CSI's reliance on *Seneca Foods Corp. v. United States*, 663 F. Supp. 3d 1325 (Ct. Int'l Trade 2023), at pages 25-27 of its brief is also misplaced. CSI mischaracterizes that case as holding that USS's certified statement that it could provide 100 percent of Seneca's requirements fort tin mill products should not be credited because USS "did not offer sufficient volume through spot sales." Mot. at 26 (citing *Seneca*, 663 F.Supp.3d at 1337). In that case, the court found that "Commerce disregarded Seneca's representations and evidence that emphasized that USS was unwilling to offer any volume—spot or contract." *Seneca*, 663 F. Supp. 3d at 1337. Specifically, the record contained evidence that "U.S. Steel was unwilling even to give {Seneca} a quote for tin mill products due to its inability to supply any additional material in 2021 or beyond." *Id*. That is not the case here. Indeed, it is CSI who [

], Appx6787. Similarly, CSI proffers *no evidence* regarding the

amount of steel that USS was capable of selling to it, whereas USS offered

evidence that it [

].  *Id.*

        2.    <u>USS Could Produce In A Timely Manner</u>

Commerce reasonably concluded that USS could timely produce subject

steel.  "ITA analyzed CSI's submitted evidence and concluded that it was not

sufficient to contradict U.S. Steel's certified statements and supporting

documentation that U.S. Steel produces or could produce a sufficient amount

of the product within eight weeks."  Appx1410.  CSI asserted only that USS

was incapable of producing steel in sufficient quantities and, as a result, it

could not timely manufacture sufficient product to meet CSI's needs.

Appx1410.  Commerce rejected this contention because it concluded that USS

had sufficient capacity to produce subject steel and that its production lead

times were within the eight-week regulatory window.

Specifically, CSI stated "no" in response to the question whether it was

challenging U.S. Steel's manufacture time, and "yes" to delivery times.  *Id.*

(citing Appx6738).  "CSI in its rebuttal form and attachment then argue{d}

that because U.S. Steel cannot produce the product in sufficient quantity, it

therefore cannot deliver the product in a timely manner."  *Id.* (citing

Appx6738; Appx6762-71).  Commerce explained that the "relevant test under

the regulation is 'whether a product is currently being produced or could be

produced within eight Weeks in the amount needed.'" Appx1410 (quoting 15
C.F.R. Part 705, Suppl. 1 at ¶ (c)(6)(i) (2018)). Because "CSI d{id} not contest
U.S. Steel's manufacturing time, and challenge{d} only U.S. Steel's delivery
times and production capacity" Commerce concluded that U.S. Steel produces
or could produce the product within eight weeks." *Id.* Commerce also
reviewed the evidence to explain that, "even if delivery time and production
capacity were relevant . . ., U.S. Steel submitted in its surrebuttal non
contemporaneous documentation indicating that it could feasibly produce and
deliver the requested quantity within eight weeks, and that it possesses
additional capacity to increase its production." *Id.* (citing Appx6787).
Commerce weighed USS's evidence against CSI's "more-generalized
allegations" to conclude that

> Based on analysis of the information submitted, ITA
> finds that U.S. Steel's evidence, consisting of its
> certified responses and confidential delivery and
> shipping data, refutes CSI's more-generalized
> allegations suggesting that U.S. Steel completely
> lacks available production capacity and an ability to
> produce and deliver the requested product within
> eight weeks.

*Id.*

In sum, Commerce did not disregard any evidence. *Seneca*, 663
F.Supp.3d at 1337. Indeed, Commerce "account{ed} for evidence that
detract{ed} from the conclusion" and rendered a conclusion that is

"reasonably supported by the record evidence." *NLMK Pennsylvania, LLC v. United States*, 558 F.Supp.3d 1401, 1406-07 (Ct. Int'l Trade 2022).

B.    <u>Commerce Reasonably Denied The 2020 Requests</u>

As with the 2018 requests, Commerce reasonably weighed all of the record evidence to find that USS was capable of timely providing the amount of steel covered in CSI's 23 separate exclusion requests.  Appx1011-19.

1.    <u>USS Could Produce A Sufficient Amount</u>

The parties' own course of dealing demonstrates actual domestic ability to produce.  The record demonstrates that CSI offered to buy steel slab that, if purchased monthly, would have exceeded the 425,000 MT (468,000 NT) aggregate volume of CSI's 23 exclusion requests from 2020.  Appx22958 ([

]).  CSI admitted that, in discussions with USS, "they would ideally like to supply CSI in the range of 20,000 to 40,000 net tons a month." Appx22931.[7]  The parties themselves acted in accordance with USS being able to provide the full volume covered by each of CSI's individual 2020 exclusion requests.  Although does CSI not confront these facts,  Commerce found this evidence compelling:  "CSI does not address or rebut U.S. Steel's claims that it was CSI's decision not to extend its contract with U.S. Steel

---

[7]  40,000 NT per month equals about 436,400 MT per year.

into 2020, nor to purchase via spot sales from U.S. Steel in late 2019."
Appx1017.

And although CSI and USS negotiated by email regarding steel
purchases, Appx22958, CSI elected provided no correspondence with USS
that might support its contention that USS was incapable of providing
425,000 MT of American steel slab.  Mot. at 29-34.  Indeed, CSI proffered
email correspondence only with [                    ] which was favorable to its
position, Appx22938, but elected not to provide any relevant negotiation
documents with USS.

Rather than address its own actions, CSI relies on the fact that USS
was idling facilities capable of producing 8.2 million MT of steel annually to
contend that it could provide no steel slab.  *Id*. at 30-31.  But USS made clear
that those assets were "readily available."  Appx22912 n.3.  And Commerce
did consider USS's idled assets and explained that "CSI provided no
information or supporting documentation that . . . demonstrates that U.S.
Steel cannot manufacture the requested quantity of the product at the three
[   ] plants it has listed."  Appx1016-17; *see also* Appx22959 (table showing
[                                                                    ]).

And CSI's arguments regarding USS's sales volumes at pages 32-34 of
its brief are unpersuasive.  USS had more than enough available capacity to
cover all of CSI's requested volume, Appx22912, Appx22959, and it was CSI

that elected not to pursue more purchases from USS.  Appx1017.  CSI's claim

that Commerce wrongly failed to find that "U.S. Steel had 'overcommitt{ed}'

its slab supply," Mot. at 34 (quoting *September 2018 IFR*, 83 Fed. Reg. at

46,037), rings hollow where the evidence reveals that it was CSI who elected

to *under*-commit.  Appx1017.

And lastly, CSI reiterated its contention from 2018 that it required

duty-free imported steel because domestic steel was too expensive.

Commerce rejected this claim, explaining that CSI's "economic justifications

for not purchasing more of the available product from domestic

manufacturers such as U.S. Steel, however, are not among the regulatory

criteria that form part of Commerce's analysis for granting or denying a

request based on availability."  *Id.*

2.    <u>USS Could Produce In a Timely Manner</u>

USS demonstrated the ability to produce in a timely manner.

Commerce "analyzed CSI's submitted evidence and concluded that it was not

sufficient to contradict U.S. Steel's certified statements and supporting

documentation that U.S. Steel produces or could produce a sufficient amount

of the product within eight weeks."  Appx1017.  Commerce explained that

the relevant test under the regulation is whether a product is currently being

produced or could be produced within eight weeks in the amount needed in

the requestor's business activities.  *Id.* (citing 15 C.F.R. Part 705, Suppl. 1 at

¶ I(6)(i) (2018)).  CSI contended that "past shipments of slabs from U.S. Steel have been delayed and have taken longer than eight weeks.  CSI states, in its rebuttals, that 'almost 50% of U.S. Steel shipment to CSI in 2018-2019 exceeded 8 weeks lead time.'"  *Id.* (quoting Appx22935).  This does not satisfy CSI's regulatory requirement.

USS explained  that a "requirement for production and delivery in eight weeks did not apply to these past contracts and spot sales it negotiated with CSI, in which 'CSI repeatedly indicated that most shipments were for stock and, as such, did not require priority delivery.'"  *Id.* (quoting Appx22993).  Likewise, Commerce explained that USS "provided evidence, consisting of its certified responses and confidential delivery and shipping data, supporting that U.S. Steel is able to produce and deliver the requested product within eight weeks."  *Id.* (citing among other things Appx22959).  In fact, based on CSI's own statements, "more than 50% of past deliveries have occurred within the 8-week time frame, illustrating that U.S. Steel produces or could produce requested product within the required time frame."  *Id.* (citing Appx22935).  Likewise, Commerce noted that "there is nothing in CSI's documentation that demonstrates that current and future production and deliveries are impacted by any past delivery issues."  *Id.*

Moreover, CSI cannot reasonably rely on USS's "alleged failures" to voluntarily deliver each and every order within 56 days.  The regulatory

standard is not a perfect history of past deliveries within 56 days.  The correct standard is "whether a product {1} is currently being produced or {2} could be produced within eight weeks in the amount needed in the business activities of the user of steel in the United States described in the exclusion request."  15 C.F.R. Part 705, Suppl. 1 at ¶ (c)(6)(i) (2018)).

In sum, Commerce reviewed and weighed all of the evidence to conclude that USS was capable of timely producing the volume of steel covered by all 23 of CSI's 2020 exclusion requests.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court the challenged determinations and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

42

/s/ Stephen C. Tosini
STEPHEN C. TOSNII
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-5196
Email:  stephen.tosini@usdoj.gov

May 20, 2024                         Attorneys for Defendant

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(2), the undersigned certifies that Defendant's Corrected Response to Plaintiff's Motion for Judgment on the Administrative Record contains 9,566 words as computed by our word processing system, excluding those portions that do not count toward the word limitation.  Our filing thus complies with the Court's Chambers Procedures.

<u>/s/ Stephen C. Tosini</u>