<u>**PUBLIC VERSION**</u>

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CALIFORNIA STEEL INDUSTRIES, INC.<br><br>    Plaintiff,<br><br>        – against –<br><br>UNITED STATES,<br><br>    Defendant. | Court No. 21-00015 |

<u>**Reply in Further Support of Remand Comments**</u>

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
CHAFFETZ LINDSEY LLP
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com

Counsel for California Steel
Industries, Inc.

<u>**PUBLIC VERSION**</u>

**TABLE OF CONTENTS**

I.  Preliminary Statement ...................................................................1

II. Argument.......................................................................................5

   A.  Commerce's Decisions are Arbitrary and Capricious
       Because They Ignore Important Aspects of the Problem..............5

     1. The Record Demonstrates that U.S. Steel Could Not
        Supply the Total Volume of CSI's Requests...............................6

     2. Commerce Ignored the Evidence that U.S. Steel Was
        Unable and Unwilling to Supply CSI Additional Slabs............11

   B.  The 2018 Redeterminations Are Flawed Because
       U.S. Steel Could Not "Immediately" Supply CSI
       More than [ ████ ] MTs of Slab Per Month....................................21

   C.  The 2020 Redeterminations Run Counter to the
       Evidence in the Record ...............................................................23

     1. Commerce Failed to Consider Evidence that
        U.S. Steel Had No Additional Capacity in
        Excess of Its Existing Commitments ......................................23

     2. The Government Reads the Timeliness Requirement
        Out of Existence........................................................................30

   D.  Commerce Must Grant Partial Relief If that Is the Only
       Reasonable Outcome...................................................................33

III. Conclusion .................................................................................35

TABLE OF AUTHORITIES

Page(s)

Cases

*CS-360, LLC v. U.S. Dep't of Veteran Affairs,*
   846 F. Supp. 2d 171 (D.D.C. 2012) ..................................................... 28

*Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.,*
   865 F.3d 630 (D.C. Cir. 2017) ............................................................ 15

*Judulang v. Holder,*
   565 U.S. 42 (2011) ............................................................................. 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
   *Auto. Ins. Co.,*
   463 U.S. 29 (1983) .......................................................................... 5, 11

*N. Am. Interpipe, Inc. v. United States,*
   519 F. Supp. 3d 1313 (Ct. Int'l Trade 2021) ........................................ 3

*Policy & Research LLC v. United States Dep't of Health and*
   *Human Servs.,*
   313 F. Supp. 3d 62 (D.D.C. 2018) ....................................................... 30

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,*
   786 F.3d 960 (Fed. Cir. 2015) ............................................................ 29

*Provisur Techs. v. Weber, Inc.,*
   50 F.4th 117 (Fed. Cir. 2022) ............................................................. 30

*Seneca Foods Corp. v. United States,*
   663 F. Supp. 3d 1325 (Ct. Int'l Trade 2023) ........................... 22, 26, 28

*Tr. Chem Co. v. United States,*
   35 C.I.T. 1012 (2011) ....................................................................... 5, 10

*United States v. UPS Customhouse Brokerage, Inc.,*
   575 F.3d 1376 (Fed. Cir. 2009) ......................................................... 9, 13

__PUBLIC VERSION__

**Other Authorities**

15 C.F.R. pt. 705, supp. 1 ................................................................ *passim*

PUBLIC VERSION

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| 2018 Requests | 170 requests for exclusion from the Section 232 tariffs submitted by CSI between April 29, 2018 and July 2, 2018 |
| 2020 Requests | 23 requests for exclusion from the Section 232 tariffs submitted by CSI on April 21, 2020 |
| Amicus Br. | *Amicus Curiae* United States Steel Corporation's Brief in Response to the Court's Orders of March 7, 2024 and April 3, 2024, ECF No. 117. |
| Commerce | United States Department of Commerce |
| CSI | California Steel Industries, Inc. |
| Defendant | United States |
| Department | United States Department of Commerce |
| Plaintiff | California Steel Industries, Inc. |
| Redeterminations | Remand Results, dated February 9, 2024, ECF No. 94 |
| September IFR | *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46,026 (Sept. 11, 2018) |
| U.S. Steel | United States Steel Corporation |

**PUBLIC VERSION**

Plaintiff California Steel, Inc. ("CSI")[1] submits this Reply in further support of its Remand Comments, submitted April 8, 2024, ECF Nos. 102 & 103 ("Comments") and in reply to Defendant's Response to Plaintiff's Remand Comments, submitted May 20, 2024, ECF Nos. 107 & 108 ("Response").

## I.    Preliminary Statement

In Commerce's Redeterminations, which are the agency's latest effort to justify its wholesale rejections of CSI's requests for exclusions, Commerce has once again fallen back on its practice of ignoring the evidence and relying, instead, on U.S. Steel's unsupported claim that it could and would gladly fill any slab needs CSI has.  That is a claim U.S. Steel has been making, and Commerce has been slavishly accepting, for over six years since CSI's initial requests in 2018.  There was no evidence to support the claim then, and there is no evidence to support it now.

Quite the opposite is true.  The record, including the history of the parties' dealings, makes it crystal clear that U.S. Steel could not and

---

[1] Terms not defined herein have the meaning assigned in CSI's Comments and in the Table of Abbreviations and Defined Terms, *supra*.

would not supply CSI with all the slab it needed. Commerce's adamant refusal to weigh and consider those facts negates its *pro forma* denials of CSI's requests.

In its Comments, CSI specifically pointed out this fatal defect in Commerce's Redeterminations and showed how the decisions turn a blind eye to record evidence demonstrating that U.S. Steel had not, could not, and would not fill CSI's slab needs. Rather than coming to grips with the problem, in its Response the Government tries to avoid it by offering to its own *post hoc* rationalizations, which Commerce never advanced or articulated. The effort is futile. After the fact rationalizations by counsel cannot and do not save Commerce's Redeterminations. It is a fundamental principal of administrative law that *the agency* must reach reasoned decisions.

Perhaps recognizing how weak the arguments advanced by Commerce and the Government are, U.S. Steel decided to join the fray, apparently hoping it can somehow help save Commerce's denials. It did so by filing a request to appear as an amicus (which CSI did not oppose), claiming it would offer "alternative arguments and contextual information." *Amicus Curiae* United States Steel Corporation's Brief in

Response to the Court's Orders of March 7, 2024 and April 3, 2024, ECF No. 117 ("Amicus Br."), at 6. It has done neither. But its dogged efforts to assure that its competitor, CSI, does not get the relief to which it is entitled does speak volumes.

As this Court held two years ago in denying U.S. Steel's attempt to intervene, the issue in this case, whether to reverse Commerce's denials, can make no legitimate difference to U.S. Steel. *See N. Am. Interpipe, Inc. v. United States*, 519 F. Supp. 3d 1313, 1326 (Ct. Int'l Trade 2021), *aff'd sub nom. California Steel Indus., Inc. v. United States*, 48 F.4th 1336 (Fed. Cir. 2022). That was true then, and it remains true today. Nonetheless, U.S. Steel has been, and continues to be, unyielding in its efforts to prevent CSI (and other competitors[2])— from receiving the tariff relief to which they are entitled. The reason is obvious and the motive is transparent: by opposing its competitors'

---

[2] For example, U.S. Steel recently attempted to submit an amicus brief in opposition to the *settlement* of another slab importer suit challenging the wholesale denials of slab exclusions sought by that importer. *NLMK Pennsylvania, LLC v. United States*, Court No, 21-00507, ECF No. 112. Judge Kelly denied the bid because, as seems obvious, U.S. Steel had nothing to contribute to a private settlement between a slab importer and the Government. *Id.* Nevertheless, U.S. Steel's indefatigable efforts to prevent its competitors from securing tariffs exclusions to which they are entitled is telling.

requests, taxing their time and resources, and now trying to buttress Commerce's efforts to rationalize its arbitrary decisions, U.S. Steel effectively tilts the downstream playing field in its favor.

Despite their efforts, however, neither U.S. Steel nor the Government can cure the fundamental flaw in Commerce's repeated denials, namely its failure to grapple with, evaluate, and consider the record evidence as required. Exacerbating the problem even further is the fact that Commerce's decisions do not even pretend to provide a rational explanation for how it weighed the evidence, why it rejected certain evidence, and how it reached its conclusions. That all remains a black box.

As a result, and as explained in detail below, the Redeterminations suffer from the same critical flaw as the original denials—the failure to grapple with contrary evidence in the record in blind deference to U.S. Steel's unsupported statements that are controverted by the actual record evidence. Until Commerce considers all the evidence in the record—including evidence detracting from the result it is so desperate to reach—and explains its reasoning, its decisions cannot be sustained.

## II.    Argument

### A.    Commerce's Decisions are Arbitrary and Capricious Because They Ignore Important Aspects of the Problem

Administrative law and basic notions of fair play require non-arbitrary decision making, which the Supreme Court has long held requires the Department to consider, *inter alia*, "important aspect{s} of the problem" in rendering its Redeterminations. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Tr. Chem Co. v. United States*, 35 C.I.T. 1012, 1024 (2011) (remanding where agency failed to consider an "important aspect of the problem").

Yet Commerce did not consider two critical issues bearing on the question before it:  (1) whether U.S. Steel could supply the total volume of slab covered by CSI's Requests (it could not); and, correspondingly, (2) even if U.S. Steel could supply some amount of the additional slab CSI requested, whether that additional volume of slab was, in the real world, "reasonably available" in light of the evidence regarding U.S. Steel's delivery problems, its active reduction in capacity from the idling of its plants, and its lack of motive or interest in providing its direct competitor CSI with more than minimal volumes of slab.

5

Commerce's failure to consider and deal with these issues means its decisions cannot stand.

### 1. The Record Demonstrates that U.S. Steel Could Not Supply the Total Volume of CSI's Requests

As Commerce knew, CSI's 2018 requests covered 2,300k MTs[3] of slab[4] and CSI's 2020 Request covered 425k MTs[5] of slab.[6] However, the Department's rules required CSI to make its requests piecemeal.[7] 15 C.F.R. pt. 705, supp. 1(c)(2) (requiring {s}eperate exclusion requests" for "distinct critical dimensions . . . covered by a common HTSUS subheading"). By mandating that CSI submit different requests for each critical dimension, rather than one request for the 2,300k MTs[8] of slab it needed in 2018 and one request for the 425k MTs[9] of slab it

---

[3] 2,535k NTs.

[4] APPX06762; APPX06765.

[5] 468k NTs.

[6] APPX22879.

[7] APPX06762; APPX06765; *see also* APPX22879.

[8] 2,535k NTs.

[9] 468k NTs.

needed in 2020, the Department artificially ensured that no single CSI

request would implicate all of U.S. Steel's capacity.[10]

Despite knowing that U.S. Steel could not supply the total volume

of CSI's requests, the Government and U.S. Steel both argue that

Commerce was free to totally disregard the issue, and view each request

on a stand-alone basis, so that if U.S. Steel could supply enough to

satisfy one of the requests, this same volume could be counted over and

over again to reject each of CSI's requests, even though the record

showed that U.S. Steel could not supply the total amount requested.

Response at 24-25, 27-30; Amicus Br. at 15-16.  That argument makes

absolutely no sense.  Commerce was fully aware of the total volume CSI

was seeking, and for it to claim that the requests should all be denied

because, viewing each one in isolation, the request could be satisfied,

although the full volume could not be, is truly bizarre.

Indeed, it was pointed out to Commerce years ago, during the

notice and comment process, that the requirement that applicants

―――――――――――

[10] Whether that was the intent or not is irrelevant, it was the plainly the effect if
Commerce is allowed to now turn around and use this as a sword to deny CSI's
requests.  Indeed, denials based on that reasoning are plainly arbitrary and
capricious.

break down their Requests into "mini-bites" could give the false impression that domestic capacity was sufficiently and reasonably available, when in fact it was not.  At the time, in response to an industry comment raising the issue, Commerce expressly recognized the problem and committed itself to considering the precise issue it now (conveniently) ignores.  The record is clear:

> Comment (f)(6)(iii)(C): How does the Department intend to deal with multiple exclusion requests where each individual request might be fulfilled from U.S. domestic parties, but the total of such requests exceeds current U.S. capacity?

> BIS response: The Department, including product experts from ITA, *will be evaluating these factors* as part of the review process when objections are received. . . . *{T}he Department agrees {the total volume of requests} should be taken into account* for an efficient and effective exclusion process.

September IFR, 83 Fed. Reg. 83 Fed. Reg. 46,026, 46,037 (Sept. 11, 2018) (emphasis added).

Mindful of the Department's commitment, and to ensure that Commerce did not overlook this issue, CSI specifically alerted the agency to the total volume of its requests in the record of each and every

request.[11]  But despite recognizing the need to consider the issue and its promise to take into account the total volume, Commerce did not do so.

The Government's attempt to avoid the issue by arguing that "each individual determination was a single final agency action, and there is no basis to 'conflate' their separate administrative records" totally misses the point.  The consequence of viewing each request in a silo is to miss the forest for the trees, which is what happened here and is exactly why CSI made certain that the *record for each request* brought this issue to the Department's attention.  Since Commerce both created the potential for the problem when it mandated that requests be broken down into bite-size pieces and also specifically recognized the need to consider this important issue, its failure to do so runs afoul of the APA.  *United States v. UPS Customhouse Brokerage, Inc.*, 575 F.3d 1376, 1382-83 (Fed. Cir. 2009).

In an effort to save its own error, the Government mischaracterizes CSI's argument as amounting to a claim that "if the domestic industry could timely provide 99 percent of its aggregate

---

[11] APPX06762; APPX06765; APPX22879.

requested volumes, then all 100 percent of that volume must enter duty free." But that is not the argument at all. More accurately stated, CSI's point is that it is unreasonable for Commerce to take the position, as it has, that if the domestic industry can produce 10-12 percent of the aggregate requested volumes (as the record showed to be the case), that 10-12 percent can be reused over and over to justify denying each individual request.

The agency's conduct here is, we submit, particularly egregious. Having recognized the importance of the issue and having committed to account for it, it is patently arbitrary and unfair for the agency to then ignore the issue when it compels a result the Department does not want to reach. Yet that is precisely what Commerce did here. *See Tr. Chem*, 35 C.I.T. at 1024 (holding decision "arbitrary and capricious" for failure to consider an "aspect of the problem" previously recognized as "important," where Commerce first rejected a commodity surrogate value because the data source was "inflated," but later accepted a similarly inflated surrogate value for the same commodity from the same data source without explanation).

2.  **Commerce Ignored the Evidence that U.S. Steel Was Unable and Unwilling to Supply CSI Additional Slabs**

In its Amicus brief, U.S. Steel brazenly (but not surprisingly) argues that Commerce did not have to consider whether U.S. Steel was willing to sell CSI slabs in the volume that CSI requested.  Amicus Br. at 13-15.  Of course, U.S. Steel did not want Commerce to consider its willingness to sell the full volume of slab CSI sought because, in fact, it knows it never was willing or able to supply CSI the total volume of slab CSI needed.  But, putting aside for the moment U.S. Steel's motive, the agency's obligation was to consider "important aspect{s} of the problem" in deciding whether slab was "reasonably available" in "sufficient" quantity.  *See State Farm*, 463 U.S. at 43; 15 C.F.R. pt. 705, supp. 1(c)(6).  This clearly encompassed the reality of U.S. Steel's willingness to actually provide the slabs it claimed it could supply.

The record shows that, at the time of CSI's requests, U.S. Steel lacked the actual capacity to meet CSI's needs.[12]  Moreover, rather than showing a willingness to even try to meet CSI's needs, the record reflects that U.S. Steel *was actively reducing its already insufficient*

---

[12] APPX06787; APPX22956-APPX22957

PUBLIC VERSION

*capacity*, ensuring it could never meet CSI's needs. Yet, Commerce entirely ignored this evidence, and failed to address how this weighed on the determination of sufficient and reasonable availability.

A cursory examination of the record reveals the significance of Commerce's failure. In its confidential surrebuttals, U.S. Steel "certified" that it had [███████████████████████] in 2018[14] and [██████] MTs[15] in 2020.[16] But three key pieces of record evidence reveal that this "capacity" was no more than a theoretical or "paper" capacity, which U.S. Steel could not (and would not) translate into actual sales to CSI. Commerce failed to consider any of this evidence.

*First*, the record demonstrates that U.S. Steel had idled significant portions of its claimed capacity and would not be able to revive those plants and have that potential capacity available within eight weeks to supply CSI.[17] September IFR, 83 Fed. Reg. at 46,038 (BIS response to Comment (f)(6)(iii)(D)) (explaining that for the product

---

[13] [██████] NTs.

[14] APPX06787.

[15] [██████] NTs.

[16] APPX22959.

[17] APPX06782, APPX06783, APPX22885, APPX22912.

to be "reasonably available" it must be able to be "produced and delivered 'within eight weeks' in the amount needed for the business activities described in the exclusion request."); *see also* 15 C.F.R. pt. 705, supp. 1(c)(6)(i).  For CSI's 2018 Requests, U.S. Steel's confidential surrebuttal purportedly showed that its [          ] facility had available capacity to produce [                                      ].[19] But the record also shows that, as U.S. Steel conceded, its [        ] facility was idled and therefore had *no* capacity (raw or otherwise).[20]  The record further reveals that the plant was not slated to be brought back online until "4Q 2018."[21]  Unfortunately, Commerce inexplicably (and irrationally) relied on that phantom capacity—which was, by definition, not "reasonably available" under Commerce's regulation—to support its denials of CSI's requests.  *UPS Customhouse*

---

[18] [        ] NTs.

[19] APPX06787.  Because U.S. Steel's mills produce both slab and finished products, it is not at all clear from the record that [                    ] equals "slab capacity."  Commerce provided to explanation as to how, if at all, that distinction factored into its Redeterminations.

[20] APPX06782, APPX06783.

[21] APPX06783; *see* APPX06720; APPX06782, APPX06787.

*Brokerage*, 575 F.3d at 1383 (remanding CBP decision for failure to follow own regulations).

For the 2020 Requests, U.S. Steel similarly reported in its confidential surrebuttal that [████████████████████████████ ████] facilities had the [████████████] to produce [████ ████████████████].[23] But again, U.S. Steel elsewhere in the record conceded that it had idled furnaces at those facilities, meaning that the [██████] MTs[24] of "available capacity" U.S. Steel reported was hypothetical, not real.[25]

By saving these fallacious (and internally contradictory claims) for a confidential attachment in its surrebuttal, U.S. Steel precluded CSI from pointing out these inconsistencies to Commerce. But that did not relieve Commerce of its obligation to review the record and reach reasonable, fact-based decisions. Any fair-minded decision-maker reviewing the record would have seen the evidence, identified the inconsistencies, and at least explained how they were reconciled in

---

[22] [██████] NTs.

[23] APPX22959.

[24] [██████] NTs.

[25] APPX22912; *see* APPX22885.

reaching the final decision. But Commerce did none of that. It closed its eyes to the facts, and again blindly relied on U.S. Steel and its phantom capacity to support its denials. Because that decision is totally contrary to the evidence in the record, it is *perforce* arbitrary and cannot stand. *Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017) (agency must "reasonably reflect upon the information contained in the record and grapple with contrary evidence").

*Second*, U.S. Steel's sales data submitted in connection with the 2020 Requests corroborated that, whatever its theoretical "capacity" might have been, it simply would not sell slab to anyone in the volumes CSI required. As explained at pages 32-33 of CSI's Comments, U.S. Steel's total domestic slab sales to all purchasers (not just CSI) amounted to [ ██ ] MTs[26] in 2018, [ ██ ] MTs[27] in 2019, and [ ██ ] MTs[28] through June 2020 (or [ ██ ] MTs[29] on an annualized basis).[30]

---

[26] [ ██ ] NTs.

[27] [ ██ ] NTs.

[28] [ ██ ] NTs.

[29] [ ██ ] NTs.

[30] This data come from U.S. Steel's sales data at APPX22956-22957.

In short, the record evidence of U.S. Steel's actual conduct plainly showed that over a period of three years, although objecting to every request covering slab made by CSI and others, U.S. Steel failed to provide the *entire market* with the amounts CSI alone was requesting.

*Third*, U.S. Steel did not sell large amounts of slab, as the record shows, because it needed the slab it produced for its own production of the downstream finished products that it offered in competition with CSI and others.[31]  CSI explained to Commerce that U.S. Steel and CSI are competitors for the downstream products, meaning it is better business for U.S. Steel to use the slab it produces to make its own products rather than sell it to CSI.[32]

In its Response, the Government claims, based upon the sales data discussed above, that U.S. Steel had "dispelled the contention" that it would not sell slab in the domestic market.  Response at 34. Again, the Government misses the point.  CSI never claimed that U.S. Steel would not sell slab in the domestic market.  Of course, U.S. Steel has sold, and CSI has purchased, *some* slab.  That is not the issue.

_____

[31] APPX06764, APPX06682, APPX06766-06770; APPX22881.

[32] APPX06764, APPX06679, APPX06682, APPX06766-06770; APPX22881.

The issue is the *volume* of those sales compared to CSI's needs. The fact that Commerce failed to address this critical issue, including the evidence that U.S. Steel had failed to provide the volumes of slab it had committed to supply in connection with prior objections, is another fatal flaw. Indeed, by ignoring the issue, Commerce undermined the very purpose for having exclusions, which is to permit importations without an added tariff when the product is "not produced in the United States in *a sufficient and reasonably available amount.*" 15 C.F.R. pt. 705, supp. 1(c)(6) (emphasis added). That is precisely the case here— *the limited amounts U.S. Steel sold to the entire domestic industry over a period of years was less than CSI's annual requirements for any single year.*[33]

It is impossible to rationally conclude, on this record, that U.S. Steel could nevertheless satisfy all of CSI's slab needs, the needs of the other domestic producers it promised to provide with slab, plus U.S. Steel's own needs. And that decision, which runs counter the evidence in the record, was plainly arbitrary and capricious.

_____

[33] *Compare* APPX22956-22957 (showing U.S. Steel best sales year was [█████████████]), *with* APPX06740, APPX22881 (showing CSI required 2,300k MTs per year to meet its target utilization).

Furthermore, it was arbitrary and capricious for Commerce to reach its decisions without even addressing the evidence bearing on yet another important issue Commerce previously recognized must be considered, namely whether an objector had failed to meet commitments it made in opposing prior exclusion requests. 15 C.F.R. pt. 705, supp. 1(c)(6)(i). As CSI pointed out to the Department, the paltry amount of slab U.S. Steel supplied to CSI and others fell well short of the volume U.S. Steel had promised that it would provide to CSI in prior objections.[34]

Faced with all of the foregoing, the Government nonetheless tries to suggest that Commerce considered all the evidence and found U.S. Steel was willing and able to supply the volume of slab sought. Response at 33. That, however, is a wish, not a fact.

It is telling that the Government does not, and cannot, point to where in its decisions Commerce actually considered the issue and explained how it assessed the evidence showing that U.S. Steel had not met the commitments it had made in submitting prior objections. The

---

[34] APPX22931.

plain fact is Commerce did not consider these matters.  Indeed, even if Commerce had in some sense "considered" the issue and the evidence (of which there is no indication), Commerce's failure to explain how the evidence factored into its decision is fatal.  *JSW Steel*, 466 F. Supp. 3d at 1330 (remanding Section 232 denial to Commerce because Commerce's decisions "do not explain what information the sub-agencies considered, how it was weighed, or why the evidence compelled denial").

Moreover, it is interesting that even in its Amicus Brief, U.S. Steel does not claim it was willing to supply CSI with 2,300k MTs in 2018 or an additional 425k MTs in 2020.  The best it can do is to claim it was "willing" to supply CSI "significant quantities" of slab.  Amicus Br. at 19.  Of course, it deliberately does not quantify "significant" because it knows that it never would supply all the slab CSI requested and required.  The history recounted in the record before the agency confirms that fact.[35]

---

[35] APPX22956-APPX22957.

Finally, as demonstrated, the Government and Commerce's contention that CSI "limit{ed} domestic purchases" for "economic reasons" is not supported by the record. Response at 35. As an initial matter, CSI did not state that it was limiting purchases for "economic reasons." Rather, the record evidence demonstrates that CSI made repeated attempts to purchase slab from U.S. Steel, and purchased what was available, but U.S. Steel lacked the capacity and/or willingness to meet CSI's requirements.[36] CSI's reference to challenges in shipping slab to the West Coast was presented for context, as an additional reason to explain why U.S. Steel was not willing or able to sell sufficient amounts of slab to CSI.[37] That is, CSI never claimed entitlement to the exclusions based on price. CSI sought exclusions for amounts of slab that U.S. Steel could not and would not—based on the record evidence discussed—provide at any price. And Commerce failed to grapple with that evidence in denying the requests.

---

[36] APPX06787; APPX22931; APPX22956-APPX22957.

[37] APPX06764.

**B.    The 2018 Redeterminations Are Flawed Because U.S. Steel Could Not "Immediately" Supply CSI More than [██] MTs of Slab Per Month**

As explained at page 23 of CSI's Comments, U.S. Steel conceded that it could not supply CSI with more than [██] MTs[38] of slab per month until [████████████]. That is, U.S. Steel admitted that it could not provide CSI with the requested amount within eight weeks, as required by the regulation to meet the requirement that the slab be "immediately" available.[39] Comments at 23. Neither Commerce in the Redeterminations, the Government in its Response, nor U.S. Steel as Amicus,[40] addresses this fact at all. But the fact is dispositive. It shows that, whatever U.S. Steel claimed its capacity was, it could not translate that so-called capacity into slab deliveries to CSI within eight weeks in the volume CSI requested. At a minimum, therefore,

---

[38] [██] NTs.

[39] APPX06787.

[40] In the main, U.S. Steel offers no more than the generic and conclusory argument that it had "the capability to . . . produce the steel slab described in CSI's requests and ample capacity to do so." Amicus Br. at 17.

Commerce was required to grant CSI's requests for volumes in excess of [ ■ ] MTs[41] per month.[42]

The Government's attempt to distinguish *Seneca Foods Corp. v. United States*, 663 F. Supp. 3d 1325 (Ct. Int'l Trade 2023), which is directly on point, by arguing that there "U.S. Steel was unwilling to even give {Seneca} a quote for tin mill products due to its inability to supply any additional material," is futile. Response at 35 (*quoting Seneca*, 663 F. Supp. 3d at 1337). That is a distinction without a difference because the same is true here. U.S. Steel *never* gave CSI a quote for 2,300k MTs[43] of slab, and its admission that it could not provide CSI with more than [ ■ ] MTs[44] per month until [ ■■■■■■ ■ ] is analogous to the situation in *Seneca*.[45] Just as in that case, "Commerce's failure to consider and address" this evidence "resulted in arbitrary and capricious decisionmaking." 663 F. Supp. 3d at 1339.

---

[41] [ ■ ] NTs.

[42] Because CSI needed the slabs immediately, all its imports were in [ ■■■■ ■■■■■■ ]. ECF No. 60-1.

[43] 2,525k NTs.

[44] [ ■ ] NTs.

[45] APPX06787.

C.    **The 2020 Redeterminations Run Counter to the Evidence in the Record**

1.    **Commerce Failed to Consider Evidence that U.S. Steel Had No Additional Capacity in Excess of Its Existing Commitments**

Contrary to the Government's argument, the record evidence regarding the course of dealing between CSI and U.S. Steel clearly shows that U.S. Steel *could not* supply CSI with the additional 425k MTs[46] of slab CSI sought.  Response at 38.

Following implementation of the Section 232 tariffs, CSI began to purchase steel slabs from U.S. Steel and from tariff exempt sources abroad.[47]  By 2020, it recognized that it did not need to import all the slab it required (unlike in 2018, when CSI requested 100 percent of its needs under the tariffs).  Thus, CSI's 2020 Requests sought *only* 425k MTs, which was the amount of slab it needed *in excess of amounts* it could secure from U.S. Steel or from tariff-exempt sources.[48]  In other words, the Government is incorrect when it states, "even though CSI . . . had been in negotiations with USS to provide more than the total

---

[46] 468k NTs.

[47] APPX22876; APPX22882-APPX22884; APPX22886-APPX22890.

[48] APPX22874; APPX22876; APPX22879; APPX22928; APPX22930-APPX22932.

volume of 2020 requests, CSI sought exclusions from all tariffs . . . which would allow it to import all of its steel slab duty free{.}" Response at 11.

In truth, as CSI clearly explained to Commerce, its request for 425k MTs *already accounted for* the amounts U.S. Steel had made available. Specifically, CSI explained: (i) it intended to source "20,000 to 40,000 net tons {18k to 36k MTs}" per month from U.S. Steel—annualized to 432k MTs,[49] (ii) that, taking account of this 432k MTs,[50] "U.S. Steel is currently supplying 30% of {CSI's} needs";[51] (iii) CSI also intended to procure additional slab from foreign sources exempt from the Section 232 tariffs[52]; and (iv) CSI's 2020 Requests (for an additional 425k MTs) were *net of the amounts CSI could obtain from U.S. Steel and other tariff-free sources* and was therefore limited to the amount necessary to "make up the difference" in the "supply shortfalls" between CSI's needs on the one hand, and the sum of slab it could acquire from

---

[49] APPX22930; APPX22931.  432k MTs is 476k NTs.

[50] 476 NTs.

[51] APPX22928.  The math checks out: 36k MTs per month annualizes to about 30% of CSI's minimum 1,481k MTs annual need (it needed 2,300k MTs to meet its 85% target capacity utilization). APPX22880.  Thus,  36k MTs * 12 / 1,481k MTs = 29%.

[52] APPX22931, APPX22933-APPX22934.

PUBLIC VERSION

U.S. Steel and tariff-exempted sources, on the other.[53]  (Notably, CSI did not have to account for amounts it could receive from tariff-free sources, as the regulation is clear the availability of slab from these countries should not be considered in determining domestic availability. September IFR, 46,026 Fed. Reg. at 46,046 (stating that the Department "does not agree" that "{p}roduct exclusion requests must be coordinated with country exemptions to prevent 'double-dipping.'"))

The record was equally clear that U.S. Steel could not provide 425k MTs[54] of additional slab on top of the 432k MTs[55] CSI was already intending to purchase from U.S. Steel in 2020.[56]  Indeed, the record clearly demonstrates that there was no year between 2018 and 2020 in which U.S. Steel sold more that [████] MTs[57] of slabs to the domestic market as a whole.[58]  The record also shows, as previously noted, that U.S. Steel was idling capacity at the very plants it had used to supply

---

[53] APPX22931-APPX22933.

[54] 468k NTs.

[55] 476 NTs.

[56] APPX22930; APPX22956-APPX22957.

[57] [████] NTs.

[58] APPX22956-APPX22957.

CSI.[59]  The notion that, after idling this capacity, U.S. Steel would somehow be able to double its annual slab output is simply not credible. Nor could the Department properly accept U.S. Steel's bald representation that it could and would supply all this additional slab without explaining why and how it accepted U.S. Steel's "say so" in the face of the evidence of U.S. Steel's contradictory conduct.  *Seneca*, 663 F. Supp. 3d at 1339 (remanding Section 232 denial where Commerce failed "to consider and address" "countervailing evidence").

Once again, we must note that Commerce never even addressed the issue, let alone any of the evidence set out above.  Instead, the Government is now attempting to defend Commerce's omissions by arguing that the agency was free to ignore CSI's evidence and by also claiming that Commerce considered evidence that it plainly did not. Response at 38-40.

*First*, the Government credits U.S. Steel's "certified" statement that "CSI elected to under-commit" to U.S. Steel by "deci{ding} not to extend its contract with U.S. Steel in 2020."  Response at 38, 40.  But

---

[59] APPX22885, APPX22912.

the record evidence contradicts this claim. CSI expressly told Commerce that it was "in discussion with U.S. Steel currently about potential slab purchases for remainder of 2020,"[60] and informed Commerce that U.S. Steel *only* offered to supply CSI 30% of its minimum needs.[61] Commerce was required to weigh this countervailing evidence against U.S. Steel's statement about CSI's "under-commitment." However, there is no evidence that Commerce considered CSI's evidence at all but rather acquiesced to U.S. Steel's self-interested *ipse dixit*. This is particularly troubling given the absence of any evidence from U.S. Steel that it actually offered additional slab to CSI, and the evidence that CSI had already accounted for the amounts U.S. Steel offered in fixing the volume covered by its requests. Likewise, as previously noted, U.S. Steel's own sales data (which the Government does not even claim the Department considered in this context, Response at 39) showed that the most slab it sold in a single year between 2018 and 2020 to the entire U.S. market was only [█]

---

[60] APPX22931.

[61] APPX22931.

percent[62] of CSI's *minimum* needs.[63]  This strongly corroborates CSI's evidence that U.S. Steel never offered to supply a sufficient amount of slab to CSI.  Choosing one party's "certified statements" and ignoring the other evidence, is quintessentially arbitrary and capricious.  *See Seneca*, 663 F. Supp. 3d at 1339 (remanding for relying on U.S. Steel's "certified statements" without considering "countervailing evidence").

*Second*, the Government cannot seriously contend that Commerce considered and rejected the evidence showing that U.S. Steel's idled capacity precluded it from providing the additional 425k MTs of steel slabs CSI needed because Commerce did no such thing.  Response at 39. Indeed, to make that *post hoc* argument, the Government literally had to rewrite the Redeterminations by inserting the word "idled" into them. The effort, albeit creative, cannot save Commerce.  *See CS-360, LLC v.*

---

[62] [████] MTs / 1,481k MTs = [██]%.  APPX22956-22957.

[63] Similarly, the Government's argument at page 38 of its Response is incorrect that the [██] NTs offer in U.S. Steel's email correspondence represents an annualized [██] NTs offer.  The correspondence shows that the offer was a one-time offer, and U.S. Steel itself explains that this correspondence was not about a monthly commitment, but about "spot sales negotiations."  APPX22949 (explaining that the sales correspondence in U.S. Steel's Confidential Attachment 2 is "*spot sale* negotiations" (emphasis added)).  That spot offer was in October 2019—nowhere near eight weeks of any of CSI's requests.  It provides no evidence that U.S. Steel would supply CSI sufficient volumes of slabs to meet the needs in its Requests.

*U.S. Dep't of Veteran Affairs*, 846 F. Supp. 2d 171, 189–90 (D.D.C. 2012) (holding that agency's explanations on judicial review were improper "post hoc rationalizations" and noting that citations to the agency decisions were "{c}onspicuously absent" from the agency's brief).

The APA prohibits Commerce from "disregard{ing}" evidence, like the evidence regarding U.S. Steel's idle capacity, "without explanation." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015). Yet there is no explanation in the Redeterminations as to whether, let alone how, Commerce considered U.S. Steel's idling of its own capacity. Of course, the only rational, non-arbitrary conclusion that could be drawn is that the idling of its facilities reduced US. Steel's ability to provide further slab to CSI. However, despite the uncontroverted record evidence,[64] the Department did not consider the issue at all.

Finally in this regard, the Government's attempt to save the Redeterminations by relying on a footnote in U.S. Steel's objection stating that its idled capacity was "readily available," is a weak reed.

---

[64] APPX22885, APPX22912.

Response at 18.  As an initial matter, Commerce, not the Government,

has to provide the reasons for its decisions.  But more basically, the

Regulations required U.S. Steel to "specify in writing . . ., the timeline

the objector anticipates in order to start or restart production of the

steel included in the exclusion request to which it is objecting . . .

specif{ying} the steps that will occur over the weeks needed to produce

that steel."  15 C.F.R. pt. 705, supp. 1(d)(4).[65]  *Policy & Research LLC v.*

*United States Dep't of Health and Human Servs.*, 313 F. Supp. 3d 62,

83 (D.D.C. 2018) ("Under the most elementary precepts of

administrative law, an agency . . . cannot undertake to act in a manner

that is contrary to its own regulations.").

> 2.    **The Government Reads the Timeliness Requirement Out of Existence**

The Government now argues that CSI "does not satisfy {its}

regulatory requirement" to show that U.S. Steel could not supply slab in

---

[65] As Amicus, U.S. Steel suggests that Commerce could have relied on other domestic capacity besides U.S. Steel's to deny CSI's Requests.  Amicus Br. at 10 & n.1.  That speculation is interesting but unhelpful. The APA requires Commerce to "fully and particularly set out the bases upon which it reached its decision," which requires explaining that it based its decision on other capacity, if that was the basis for the decision.  *Provisur Techs. v. Weber, Inc.*, 50 F.4th 117, 123 (Fed. Cir. 2022) (remanding decision to agency where it failed to adequately explain the basis for its determination).

PUBLIC VERSION

a timely manner.  Response at 41.  The Government has it backwards.
Under the regulation, U.S. Steel, not CSI, bears the "burden . . . to
demonstrate that the exclusion should be denied" by showing it can
provide slabs "immediately," i.e., within eight weeks.  September IFR,
83 Fed. Reg. at 46,029.  That is what U.S. Steel did *not* do.

CSI proffered all the evidence in its control to show that U.S. Steel
could not supply the slab in the requisite time—namely, evidence that
U.S. Steel had not done so in the past and that it could not in the future
because it had idled a number of critical facilities.[66]  Commerce however
brushed the evidence aside, asserting that there was "nothing in CSI's
documentation that demonstrates that current and future production
and deliveries are impacted by any past delivery issues."[67]  That is
nonsensical.  Of course, past delivery issues are probative of future
delivery problems.  They are not necessarily dispositive, but they are
probative and to just waive them aside, as Commerce did, reflects either
a basic lack of business understanding or a desperate desire not to
consider all the evidence.  In any event, CSI *could not* have supplied

---

[66] APPX22885, APPX22933; *see also* APPX22912.

[67] APPX01017.

any evidence to rebut U.S. Steel's claimed delivery times because U.S. Steel offered those delivery times in a confidential submission in a surrebuttal that CSI never saw or had an opportunity to rebut. Again, that did not absolve Commerce of its duty to weigh the relevant evidence and provide a reasoned explanation for its conclusion.

Commerce's decision to simply discount or ignore the evidence CSI presented concerning delivery failures, without any substantive analysis or explanation, and to shift the burden to CSI to rebut submissions it was never given an opportunity to address, makes it impossible for a requestor like CSI to ever controvert an objector's certified (but unsupported) statement on delivery time. Commerce's approach of accepting U.S. Steel's bald statement that there will not be any further problems, without any evidence that past issues were corrected or what steps have been taken to correct them, is unsustainable. It is arbitrary and capricious.

PUBLIC VERSION

### D. Commerce Must Grant Partial Relief If that Is the Only Reasonable Outcome

The Government in effect concedes, as shown, that *at best*, U.S. Steel could provide only a portion of the slab CSI sought to import.[68] But the Government strangely argues that Commerce did not have to grant CSI partial relief because, the Government claims, CSI did not ask for it and somehow waived it.  Response at 30.  That claim has no basis in the regulation and is factually untrue in any event.

The regulation requires Commerce to grant an exclusion request in part under two circumstances: (1) if an objector is only "able to produce a portion of the requested quantity of a steel or aluminum article within the required time needed by the importer," Section 232 Steel and Aluminum Tariff Exclusions Process, 85 Fed. Reg. 81,060, 81,066 (BIS Responses to Comment (d)(3));[69] or (2) when the objector's timeline to bring new capacity online "warrants a shorter validity

---

[68] APPX06787; APPX22956-APPX22957.

[69] We cite above a December 14, 2020 amendment to the regulation, which is not applicable to the Redeterminations.  However, in that amendment, Commerce explained that it was "clarify{ing}" that it always had the authority to order an exclusion of only the partial volume of the request.  85 Fed. Reg. at 81,066.

period" (i.e., when it is greater than eight weeks but less than the one-year default period).  15 C.F.R. pt. 705, supp. 1(h)(2)(iv)(B).

It is incumbent upon the agency to render a reasoned decision based on the standard in the regulation.  *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (holding that courts must "ensur{e} that agencies have engaged in reasoned decisionmaking").  If, as is the case, the record demonstrates that at least some part of the volume for which CSI requested an exclusion was not reasonably available in the United States, then CSI was plainly entitled to an exclusion for that amount. In other words, if partial relief is what the record and the regulation require, then that is the reasoned decision the agency must render.  The Government's claim that Commerce could just ignore granting partial relief, even if warranted by the facts, lacks merit, particularly since the Department's own regulation requires it.

Moreover, the entire factual premise for the Government's new "waiver" argument is flawed.  Considering the issues raised in CSI's comments and CSI's request that the Court instruct Commerce "to issue reasoned decisions," it is clear that CSI was seeking the maximum relief to which it is entitled.  *See* Proposed Order, ECF Nos. 105 & 106.  If,

after a fair review of the record, CSI is entitled only to partial relief, then that is what it was seeking. The Government's argument that, on remand, even if the record supports partial relief Commerce is free to ignore the evidence and not grant the relief because CSI supposedly did not raise the point in its Comments is a "gotcha" argument. It is merely a weak attempt to find some loophole possible to exonerate Commerce's flawed Remand Redeterminations.

## III. Conclusion

This has been a long running saga for CSI, as the Court knows. CSI paid the tariffs in issue years ago and, since then, has had to finance and wage a perpetual fight with Commerce (and U.S. Steel) to get the relief it has been entitled to all along. If justice delayed is justice denied (and it is), it is time, we respectfully submit, to put an end to this modern-day *Jarndyce v. Jarndyce*. Commerce has failed, despite the opportunity the Court has given it, to seriously reconsider and correct its mistakes. That should no longer be tolerated.

For the foregoing reasons, CSI respectfully requests the Court to remand the Redeterminations consistent with CSI's Proposed Order. ECF Nos. 105 & 106.

Dated:      New York, New York
            June 10, 2024

Respectfully submitted:

CHAFFETZ LINDSEY LLP
By:   /s/ Sanford Litvack

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com
*Counsel for Plaintiff California*
*Steel Industries, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that CSI's Reply in Further Support of Remand Comments, filed on June 10, 2024 complies with the word limitation requirement. The word count for CSI's Remand Comments, as computed by Chaffetz Lindsey LLP's word processing system, is 6,737.

/s/ R. Matthew Burke
R. Matthew Burke

**PUBLIC VERSION**

## AMENDED APPENDIX 1
### Challenged 2018 Requests

| Request No. | Redetermination First Page | Redetermination Last Page | Record First Page | Record Last Page |
|---|---|---|---|---|
| BIS-2018-0006-5348 | APPX01405 | APPX01410 | APPX06665 | APPX06787 |
| BIS-2018-0006-5375 | APPX01471 | APPX01476 | APPX07880 | APPX07982 |
| BIS-2018-0006-5376 | APPX01477 | APPX01482 | APPX07983 | APPX08085 |
| BIS-2018-0006-5385 | APPX01513 | APPX01518 | APPX08589 | APPX08717 |
| BIS-2018-0006-5389 | APPX01525 | APPX01530 | APPX08842 | APPX08965 |
| BIS-2018-0006-5392 | APPX01537 | APPX01542 | APPX24914 | APPX25020[70] |
| BIS-2018-0006-5393 | APPX01543 | APPX01548 | APPX09214 | APPX09337 |
| BIS-2018-0006-5399 | APPX01561 | APPX01566 | APPX09467 | APPX09582 |
| BIS-2018-0006-5404 | APPX01573 | APPX01578 | APPX09684 | APPX09783 |
| BIS-2018-0006-5409 | APPX01579 | APPX01584 | APPX09784 | APPX09889 |
| BIS-2018-0006-5452 | APPX01585 | APPX01590 | APPX09890 | APPX10008 |
| BIS-2018-0006-5487 | APPX01645 | APPX01650 | APPX11023 | APPX11146 |
| BIS-2018-0006-5492 | APPX01651 | APPX01656 | APPX11147 | APPX11267 |
| BIS-2018-0006-5496 | APPX01663 | APPX01668 | APPX11383 | APPX11503 |
| BIS-2018-0006-5497 | APPX01669 | APPX01674 | APPX11504 | APPX11624 |
| BIS-2018-0006-5511 | APPX01699 | APPX01704 | APPX12099 | APPX12216 |
| BIS-2018-0006-8301 | APPX01837 | APPX01842 | APPX15146 | APPX15262 |
| BIS-2018-0006-8334 | APPX01933 | APPX01938 | APPX17033 | APPX17152 |
| BIS-2018-0006-8338 | APPX01939 | APPX01944 | APPX17153 | APPX17273 |
| BIS-2018-0006-8368 | APPX01945 | APPX01950 | APPX17274 | APPX17394 |
| BIS-2018-0006-8372 | APPX01957 | APPX01962 | APPX17516 | APPX17636 |
| BIS-2018-0006-8377 | APPX01963 | APPX01968 | APPX17637 | APPX17757 |
| BIS-2018-0006-8380 | APPX01969 | APPX01974 | APPX17758 | APPX17886 |
| BIS-2018-0006-8385 | APPX01975 | APPX01980 | APPX17887 | APPX18005 |
| BIS-2018-0006-8388 | APPX01981 | APPX01986 | APPX18006 | APPX18130 |
| BIS-2018-0006-8391 | APPX01987 | APPX01992 | APPX18131 | APPX18257 |
| BIS-2018-0006-8395 | APPX01993 | APPX01998 | APPX18258 | APPX18384 |
| BIS-2018-0006-8401 | APPX02005 | APPX02010 | APPX18512 | APPX18638 |
| BIS-2018-0006-8407 | APPX02011 | APPX02016 | APPX18639 | APPX18765 |
| BIS-2018-0006-8429 | APPX02035 | APPX02040 | APPX19147 | APPX19255 |
| BIS-2018-0006-8433 | APPX02053 | APPX02058 | APPX19501 | APPX19625 |

---

[70] We update this Appendix with the record for Request No. BIS-2018-0006-5392. The confidential administrative record for that Request was "inadvertently omitted" from the administrative record that the Government initially filed, which has since been remedied.  *See* ECF No. 118 at 1.  For the convenience of the Court, we have updated Appendix 1 and we reattach Appendix 2 (without updates) on the next page.

PUBLIC VERSION

**APPENDIX 2**
**Challenged 2020 Requests**

| Request No. | Redetermination First Page | Redetermination Last Page | Record First Page | Record Last Page |
|---|---|---|---|---|
| 82953 | APPX01011 | APPX01019 | APPX22868 | APPX22960 |
| 82957 | APPX01020 | APPX01028 | APPX22961 | APPX23053 |
| 82962 | APPX01029 | APPX01036 | APPX23054 | APPX23248 |
| 82989 | APPX01037 | APPX01044 | APPX23149 | APPX23240 |
| 82991 | APPX01045 | APPX01053 | APPX23242 | APPX23333 |
| 83005 | APPX01072 | APPX01080 | APPX23518 | APPX23609 |
| 83015 | APPX01089 | APPX01096 | APPX23702 | APPX23794 |
| 83019 | APPX01097 | APPX01105 | APPX23795 | APPX23886 |
| 83026 | APPX01106 | APPX01113 | APPX23887 | APPX23980 |
| 83031 | APPX01114 | APPX01122 | APPX23981 | APPX24073 |
| 83039 | APPX01131 | APPX01138 | APPX24168 | APPX24261 |
| 83043 | APPX01139 | APPX01147 | APPX24262 | APPX24354 |
| 83046 | APPX01148 | APPX01156 | APPX24355 | APPX24447 |
| 83049 | APPX01157 | APPX01165 | APPX24448 | APPX24540 |